**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF TOLEDO, Plaintiff–Appellee,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant–Appellant.**

No. 88–3503.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1989.

Decided Jan. 24, 1990.

---

G. Stuart O'Hara, Jr. (argued), Buckingham, Holzapfel, Zeiher, Waldock & Schell, Sandusky, Ohio, for plaintiff-appellee.

William H. Woods (argued), Dennis D. Liston, McNamara & McNamara, Columbus, Ohio, for defendant-appellant.

Before WELLFORD and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.

WELLFORD, Circuit Judge.

This is a saga indicating one of many problems recently encountered in this country by savings and loan institutions which operated with something less than prudence and sagacity in the handling and use of customer savings. This case also illustrates the fast and loose manner of operation of financial houses such as those involved here, forced into bankruptcy by reason of the inadequate practices and safeguards utilized by these businesses.

Beginning in the early 1980s, the Savings Building and Loan Company of Sandusky, Ohio (Sandusky), predecessor by reason of merger to plaintiff, First Federal Savings and Loan Association of Toledo (First Federal), entered into a series of repurchase agreements with Bevill Bresler & Schulman, Inc. (INC) and Bevill Bresler & Schulman Asset Management Corp. (AMC).

The repurchase agreements between these parties involved the purchase and sale of government securities. In a repurchase agreement transaction, a customer enters into an agreement with a broker or dealer to purchase government securities at a certain price, with the promise by the dealer or broker to purchase back, or repurchase, the same securities at a later date for a higher price. The difference between the initial purchase price and the repurchase price is the profit to the customer. While a repurchase agreement is in effect, or "open," the customer generally is not entitled to receive interest or principal payments which may come due on the underlying security. The interest received by the customer is controlled by the repurchase agreement itself. In the instant case, Sandusky was the customer, while AMC and INC were the dealers.

A safekeeping arrangement was established by utilizing the services of a third party, Bradford Trust Co. (Bradford). The safekeeping agreement was entered into by Sandusky and Bradford whereby, upon executing a repurchase agreement with INC or AMC, Sandusky would wire transfer the purchase price of the security into its account at Bradford. Bradford would then, following deposit of the underlying security with it, forward the purchase price either to INC or to AMC. Upon expiration of the term of the repurchase agreement, Bradford would transfer the security to INC or AMC following payment to it by INC or AMC of the repurchase price. Bradford would then wire the repurchase price to Sandusky. While the repurchase agreements were open, Bradford did not register the underlying securities in the name of Sandusky.

In or about April 1983, Sandusky appointed INC as its attorney-in-fact empowering INC to act on Sandusky's behalf in the repurchase agreements. According to First Federal, this arrangement worked satisfactorily until early 1985.

Bradford provided monthly statements to Sandusky, showing activity in and out of the safekeeping account. At times, errors would appear on the statements reflecting the wrong security or no security underlying a repurchase agreement. These errors generally were corrected with a telephone call between Joel Schilling, an employee of AMC, and Charles Warren of Sandusky.

A review of the record indicates that most transactions regarding the repurchase agreements and the safekeeping account were done via telephone. Frequently, there was no written confirmation of instructions from Sandusky to either Bradford, INC, or AMC. Although Bradford sent Sandusky monthly statements of its safekeeping account, the latter frequently did not reconcile these statements with other records for several months. In short, the entire operation was sloppy and slipshod.

It was not until April 8, 1985, that then executive vice president of Sandusky, Warren, reviewed the February and March 1985 statements from Bradford.[1] Upon reconciling the statements, he discovered that three GNMA Securities underlying three repurchase agreements which should have been placed in the safekeeping account on February 21, 1985 by AMC in exchange for the million dollar purchase price paid by Sandusky were not listed on the statement. He also discovered that $1,054,000.00 of United States Treasury Bonds, paid for by Sandusky and which should have been placed in the safekeeping account by INC on January 28, 1985, was not listed on the Bradford statements.[2] When Warren then contacted Bradford, no one was able to explain why the securities underlying the repurchase agreements were not in the safekeeping account, nor where they were located except for the $1,054,000.00 U.S. Treasury Bond at 12% CUSIP No. 91210DF2.[3]

On April 24, 1985, Sandusky gave notice to its bonding company, Fidelity and Deposit Company of Maryland (F & D), of a potential loss or claim. In October 1985, following events in the New Jersey district court handling the bankruptcies of INC and AMC, Sandusky concluded that the underlying securities unaccounted for would not be recovered and that it should pursue a formal claim with F & D.[4] On

---

1. Warren admitted that he reconciled the statements at this time because he received information that AMC and INC were experiencing financial difficulties.

2. The specific property purportedly missing from the Bradford accounts included:
   A. $1,054,000.00 U.S. Treasury Bond at 12% CUSIP No. 91210DF2;
   B. $498,453.71 GNMA at 12.5% PL 111794X;
   C. $41,565.71 GNMA at 7.50% PL 12811; and
   D. $482,386.47 GNMA at 12.5% PL # 113700X.

3. On April 30, 1985, counsel for Bradford sent a letter to counsel for Sandusky regarding the results of a review of the records of Bradford. The letter stated that on or about February 4, 1985, the $1,054,000.00 U.S. Treasury Bond was delivered to Bradford. Bradford held the bond in the Customer Fully Paid Securities Account of INC until February 8, 1985, when the bonds were delivered to the account of INC at SPCSC. On January 18, 1985, Bradford had sold its security clearing business to SPCSC. The letter stated that the treasury bond at issue was delivered to SPCSC pursuant to instructions from INC and reminded Sandusky that Sandusky had given INC power as attorney-in-fact.

4. On April 8, 1985, AMC filed a voluntary petition for Chapter 11 bankruptcy in a New Jersey federal district court. On or about the same day, INC was placed into a liquidation proceeding. While the instant case was pending before the district court, a resolution of most of the issues in both the AMC and INC cases was reached. Pursuant to an agreement between the two Bevill trustees and the creditors in each case, the AWC trustee began making distribution to creditors of AMC. While these distributions are expected to reach approximately 43% of each claim, no distribution has been made to Sandusky or plaintiff. The basis for the failure to distribute was that Sandusky holds $1,065,000.00 of U.S. Treasury Bonds which had been left in its safekeeping account at Bradford after the completion of a repurchase agreement with AMC on February 21, 1985. Sandusky claimed these bonds as a setoff against the sums owed to it by AMC, pursuant to 11 U.S.C. § 553, although it claimed no independent basis of ownership of the $1,065,000.00 in Treasury Bonds.

January 24, 1986, Sandusky filed a claim under the F & D bond, but it was denied, and Sandusky (now First Federal) instituted this action.

■ We now first consider the issue of jurisdiction. Defendant F & D has raised the question from the outset and maintains its position on appeal. Fidelity contends that the Northern District of Ohio lacked jurisdiction to decide the instant matter because the Bankruptcy Code grants the district court in New Jersey exclusive jurisdiction over the property of INC and AMC. Title 28 U.S.C. § 1334(d) states:

> The district court in which a case under Title 11 ... is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

We believe, however, the Bankruptcy Code does not cover the circumstances of the instant case, which involves the interpretation of a contract between F & D and First Federal's predecessor. This contractual dispute is separate and apart from the bankruptcy case in New Jersey and involves neither INC nor AMC. Because this case does not affect the disposition of specific property within the bankruptcy estate, determinations of the bankruptcy court, while pertinent, are not dispositive of the rights under the F & D bond.

Because this case, based upon diversity jurisdiction, solely concerns the interpretation, construction, and application of an insurance contract or fidelity bond, state contract law governs. *Transcontinental & Western Air, Inc. v. Koppal,* 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953). Since the contract was entered into and negotiated in Ohio, conflict of laws authority indicates that Ohio law should control, and the district court in Ohio properly had jurisdiction of the controversy now on appeal.

This case was initially presented to the district court on cross motions for summary judgment. Based on the evidence, affidavits, and exhibits presented in connection with these motions, together with the language of the bond, the district court entered summary judgment on the issue of liability in favor of First Federal. F & D argues that the court erred by granting First Federal's motion for summary judgment because First Federal failed to present evidence on key questions such as (1) whether the securities underlying the repurchase agreements existed; (2) whether the securities were delivered to Sandusky or to Bradford; (3) whether Sandusky was the owner of the securities underlying the repurchase agreement; (4) whether the securities underlying the repurchase agreements were lost within the meaning of the policy; and (5) whether any of the securities were lost through an occurrence covered by Insuring Agreement (B). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). First Federal submits that adequate information and proof was, on all essential elements, submitted, and that there were no outstanding genuine issues of material fact to be resolved.

Insuring Agreement (B) of the bond issued obligated F & D to indemnify and hold Sandusky harmless for:

> (B) Loss of Property (occurring with or without negligence or violence) through robbery, burglary, common-law or statutory larceny, theft, hold-up, or other fraudulent means, misplacement, mysterious and unexplainable disappearance, damage thereto or destruction thereof, and loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property while the Property is (or is supposed to be) lodged or deposited within the offices or premises located anywhere, except in the mail or with a carrier for hire, other

---

Resolution of the setoff claim has subsequently been made. The New Jersey district court granted the AMC trustee's motion to recover these bonds pursuant to 11 U.S.C. § 542, and simultaneously denied Sandusky's claim of setoff.

Distribution has been made to First Federal by the INC trustee pursuant to the settlement. The distribution is expected to reach 83% of the claim. According to First Federal, it will suffer a loss of a maximum of only $179,180.00 on the INC claims. (*See* Brief of Appellee at 7).

than an armored motor vehicle company, for the purpose of transportation.

■ Plaintiff claims primarily that what happened involved a "mysterious and unexplainable disappearance" within the meaning of the insuring agreement in that the loss occurred after the bonds "were deposited within the offices or premises located anywhere." Plaintiff also contends that the loss involved "property" within the meaning of this bond definition:

Money (i.e., currency, coin, bank notes, federal reserve notes), postage and revenue stamps, ... *securities, evidences of debts*, ... bills of exchange, acceptances, notes, checks, money orders ... and all other instruments similar to or in the nature of the foregoing, in which the Insured has an interest or in which the Insured acquired or should have acquired an interest by reason of a predecessor's declared financial condition at the time of the Insured's consolidation or merger with, or purchase of the principal assets of, such predecessor or which are held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable there for.

(Emphasis added.)

We are disposed to conclude that the items "lost," or "misplaced," or misappropriated were covered by the bond's "property" definition. The bond does not require that the items involved be *owned* by the insured, but rather that the insured have "an interest" in these items. Since plaintiff has presented evidence that it paid for these missing items described in footnote 2, we hold that they are "property" covered by the bond. At the very least, moreover, First Federal has established that it has an *equitable interest* in this missing property.

■ Plaintiff argues that the very nature of a "mysterious and unexplainable disappearance" defies any requirement or burden that it explain or demonstrate the nature of or precise reason for the loss. This is a persuasive argument, but the mere fact that there was a mysterious loss does not indicate, in and of itself, that such an inexplicable occurrence has resulted in entitlement to summary judgment.

Documentation that tended to prove entitlement to or ownership in the missing articles was supposed to be in Bradford's hands, the agent of plaintiff. Although plaintiff itself could not demonstrate definitive proof of its "interest," or the exact extent of its interest, we find that this does not defeat plaintiff's bond claim. Ohio law sets out that "[l]anguage in [the] contract ... reasonably susceptible of more than one meaning will be construed liberally in favor of the insured and strictly against the insurer." *Faruque v. Provident Life & Accident Insurance Co.*, 31 Ohio St.3d 34, 508 N.E.2d 949, 952 (1987). We must, therefore, construe the bond provisions liberally in favor of plaintiff.

If plaintiff has made out a *prima facie* case that it was covered for the claimed loss, before summary judgment may appropriately be granted, defendant must be given the opportunity to present its proof to demonstrate that it is not liable for that loss. F & D claims first that the loss was excluded under Exclusion 2(e) or under Rider 162(a). The former provides:

THIS BOND DOES NOT COVER: ....

(e) loss resulting from the complete or partial nonpayment of, or default upon,

(1) any loan or transaction in the nature of, or amounting to, a loan made by or obtained from the Insured, or

(2) any note, account, agreement or other evidence of debt assigned or sold to, or discounted or otherwise acquired by, the Insured.

Whether procured in good faith or through trick, artifice, fraud, or false pretenses unless such loss is covered under insuring agreement (A), (D), or (E)

....

F & D contends that the repurchase agreement was in reality a form of a loan, and that the "loss" of the securities or property actually amounted to a breach of contract by reason of INC and AMC's failure to deliver the securities under what amounted to loan contracts. Case law has construed repurchase agreements to be loans. *See*

*Citizens National Bank of Waco v. United States*, 213 Ct.Cl. 236, 551 F.2d 832, 839 (1977) (whether a repurchase agreement is actually a loan depends on the facts of the individual case). Factors courts have considered when determining whether an agreement was a sale and repurchase or a loan include (1) whether the seller could require the purchaser to resell; (2) whether the purchaser could require the seller to repurchase; (3) whether a definite remedy was provided in event of either party's default; (4) whether the seller agreed to pay interest at a stipulated rate; (5) whether the value of the securities equalled the amount advanced; (6) whether there was evidence of a debt; and (7) whether any collateral was pledged. *See id.* 551 F.2d at 838, 841–42.

In the instant case, although the agreement has characteristics of both an outright sale and of a loan, the district court concluded that the arrangement was not in the nature of a loan, rather in the form of an outright sale. In addition, there were no provisions for default, and no "collateral" was pledged. On the other hand, factors indicating that the arrangement may have been essentially a loan include the fact that the initial purchaser could suffer no loss on the deal, and that a definite repurchase date was set forth in the agreement.

Although on balance, the transaction may not appear to be a loan as described in exclusion 2(e)(1), the district court did not address the applicability of exclusion 2(e)(2), which provides that losses resulting from nonpayment or default upon any "note, account, agreement or other evidence of debt assigned or sold to" the insured are not covered. This exclusion might apply to the transactions in question. It may be that Bradford transferred funds to AMC and INC before it ever received the underlying securities. This surmise is supported by testimony that Sandusky misunderstood its relationship with Bradford. After the securities were discovered missing, Bradford informed Sandusky that it was not responsible for ensuring that AMC and INC had transferred the underlying securities before Bradford paid INC and

AMC from Sandusky's account. If this were found to be the case, there may be a failure to deliver and/or breach of contract rather than a "mysterious" loss. In the event it were found that there was a breach of contract, then summary judgment for plaintiff may not have been appropriate. Remand to the district court for further consideration of exclusion 2(e)(2) of the F & D bond is indicated under the circumstances. Specifically, the district court should determine whether the loss was an unexplainable, mysterious loss, or whether INC or AMC merely failed, due to financial difficulties or otherwise, to deliver the securities as promised in the repurchase agreements. In the latter instance, there may have been a breach of agreement rather than an "unexplainable" loss.

■ F & D also contends that coverage under the bond is excluded by this language in Rider 621a:

It is agreed that:

1. The Underwriter [F & D] shall not be liable under the attached Bond for any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance.

As noted by First Federal, "[t]he common sense interpretation of Rider 621a is that 'trading losses' are those losses which result from fluctuations in market value of the securities purchased." This interpretation of the term "trading loss" is supported by *Lopez v. Dean Witter Reynolds, Inc.*, 591 F.Supp. 581 (N.D.Cal.1984), *aff'd*, 805 F.2d 880 (9th Cir.1986). There the court found that the term "trading losses" contained in the bond similar to that issued by F & D referred to a "decline in the value of an investor's portfolio...." *Id.* at 589. Likewise, in *Shearson/American Express, Inc. v. First Continental Bank and Trust*

*Co.*, 579 F.Supp. 1305 (W.D.Mo.1984), the court found that the trading loss clause only excluded losses resulting from changes in the value of securities.

Finally, in *Insurance Company of North America v. Gibralco, Inc.*, 847 F.2d 530 (9th Cir.1988), the court held that an exclusion similar to Rider 621a did not apply to losses resulting from missing or stolen bonds. The *Gibralco* court stated that "[t]rading losses are generally understood to be market losses sustained by firms as a result of ill-advised, unauthorized, or simply unlucky trading decisions made in the purchasing, selling, or trading of securities." *Id.* at 533. Because the losses claimed by Sandusky were not market losses, we conclude that they were not trading losses as defined in Rider 621a.

■ F & D also argues that plaintiff should not be allowed to recover judgment because of the claimed setoff in the AMC case. At the time of the filing of the bankruptcy petition by AMC, Sandusky was involved in three open repurchase agreements involving GNMAs. The agreements totaled approximately $1,000,000. Separate from these three repurchase agreements, Sandusky also held in its account at Bradford a Treasury Bond worth approximately $1,000,000. This bond was part of a repurchase agreement that had closed on the same day that the three GNMA agreements opened. The bond should have been transferred to AMC, but for some unknown reason it was not.

First Federal claimed a setoff of the bond against its losses in the AMC bankruptcy pursuant to 11 U.S.C. § 553. The New Jersey district court, however, denied First Federal's claim of setoff, and granted the trustee's motion to recover the amount of the bond. Accordingly, F & D cannot now deny coverage on the ground that

First Federal will not suffer a loss because of a claimed right of setoff against AMC.

■ F & D claims that coverage is barred because First Federal is also covered under the Securities Investors Protection Act (SIPA).[5] F & D contends that since plaintiff is entitled to protection as a customer under SIPA, it has no ascertainable bond claim for an unrecovered loss. First Federal has received a distribution from the INC bankruptcy estate totaling $697,255.65. F & D asserts that under SIPA, Sandusky was entitled to receive a pro rata share of all customer securities held by INC and that any remaining losses up to $500,000 will be paid by SIPA. Under Section 10 of the bond, F & D is not liable for any loss which is within the coverage of any other insurance or indemnity, such as that provided by SIPA.

In reply, First Federal argues that F & D supplied no evidence to the trial court establishing the existence or application of any SIPA proceeds. Plaintiff also contends that the bankruptcy settlement agreement provided that repurchase agreement participants would not receive any SIPA coverage. First Federal claims that when it receives its full distribution from the INC case, expected to total 83% of the loss suffered by Sandusky, it still will have a resulting loss not covered by SIPA insurance proceeds.

We cannot be sure from the record on the cross motions for summary judgment whether SIPA coverage exists for the repurchase agreements, or exactly what loss First Federal may suffer on its INC accounts. A remand, by reason of our uncertainty on this issue, is necessary. The district court should determine whether SIPA coverage exists, and if so, to what extent it covers the loss claimed against F & D. The district court should also determine how much of the loss will be covered in the

---

**5.** SIPA creates procedures for the orderly liquidation of financially-troubled members under which the Securities Investors Protection Corporation (SIPC) is required by assessing members to maintain a fund for customer protection. The SIPC may file an application with a court for a decree initiating liquidation proceedings if it determines that a member has failed or is in

danger of failing to meet its obligations to customers and that any one of five specified conditions indicating financial difficulty exists. The filing of the application vests the court with exclusive jurisdiction over the member and *its* property. *See Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

regular bankruptcy distributions from the New Jersey court. F & D is an excess insurer responsible if other insurance or indemnification does not apply to the claimed loss.

■ Submission to F & D of a timely proof of loss form by the insured is a condition precedent to recovery:

At the earliest practical moment after discovery of any loss hereunder, the Insured shall give the Underwriter written notice thereof and shall also, within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars.

Section 4 of the bond.

Sandusky discovered the discrepancy between its records and securities in the Bradford safekeeping account in April 1985. At that time, Charles Warren contacted Bradford to try to correct the discrepancy. Bradford did not know why the securities were not in the account, nor did Bradford know where the securities were located. Bradford indicated it would research the matter. Shortly thereafter, INC and AMC filed their petitions for bankruptcy. It was then that Sandusky notified F & D of a potential loss due to its inability to locate the four missing items.

In October 1985, following proceedings in the New Jersey bankruptcy court, Sandusky finally determined that the specific securities would not be recovered. The district court concluded that within six months of this discovery, Sandusky submitted its proof of loss to F & D, within the time limits of the bond, construing it liberally.

There was evidence that Sandusky previously had discovered the omission of securities from the safekeeping account which should have been there as part of a repurchase agreement. Discrepancies between Sandusky's records and the Bradford monthly statements were not unusual, but always had been corrected previously after contact with INC or AMC.

The district court determined that the existence of an actual loss was not reasonably discovered until October 1985. Prior to that time, it was unclear whether or not the securities could be located. This fact, coupled with the fact that other securities had previously not been deposited in the safekeeping account, but had been later located, could reasonably have prevented a determination that the missing securities would not be recovered in due course after Bradford's investigation. In any event, the facts concerning the missing items in controversy became clear in the New Jersey bankruptcy proceedings. We conclude that the proof of loss was filed within six months of the discovery, and therefore, Sandusky complied with Section 4 of the bond.

F & D argues finally that First Federal should be barred from claiming an interest in the subject property under the doctrines of collateral estoppel and estoppel by judgment, based upon the determination by the New Jersey district court that Sandusky was not the "owner" of the securities underlying the repurchase agreements.

■ Under Ohio law, collateral estoppel and estoppel by judgment operate only when there exists mutuality of parties. *Goodson v. McDonough Power Equipment, Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978, 981–82 (1983). F & D was not a party to the litigation in New Jersey. Therefore, mutuality does not exist as required under Ohio law.

■ The New Jersey court determined only that Sandusky was not an owner of the securities. As discussed earlier, Insuring Agreement (B) does not require "ownership" as a condition precedent to coverage. Instead, this provision of the bond requires only that the insured have an "interest" in the property. Because the New Jersey court did not determine that Sandusky had no *interest* in the underlying securities, its decision is not dispositive of the issues in the instant case. First Federal therefore is not barred by the doctrines of collateral estoppel or estoppel by judgment from litigating the issues in this case.

F & D also contends that various findings of fact by the district court were incorrect. We conclude that these other findings of fact are not dispositive of the case,

and even if erroneous, would not change the outcome of the case, nor constitute a prejudicial error. We do not therefore address them further in any detail.

We have affirmed the district court in many respects with regard to the numerous issues raised in this case. We RE-MAND the following issues for further consideration:

(1) Consideration as to applicability of exclusion 2(e)(2) of the bond to the facts determined, or necessary to be determined, with respect to F & D's contention that there was a breach of contract which brought about the loss.

(2) Determination of the amount recovered, or which plaintiff may recover from other sources (such as SIPA), which should be deducted from the amount of loss claimed against F & D.

Plaintiff has requested a jury trial in this complex case. Upon remand, the district court may be called upon to determine whether the issues submitted will be subject to a summary judgment or be submitted to a jury.

We AFFIRM the district court on all issues not the subject of the remand.