**RESOLUTION TRUST CORPORATION, as conservator for GreatAmerican Federal Savings and Loan Association, Plaintiff–Appellant,**

v.

**AETNA CASUALTY & SURETY COMPANY OF ILLINOIS, Defendant–Appellee.**

No. 93–3271.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1994.

Decided June 1, 1994.

Before FAIRCHILD, CUMMINGS, and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

This is yet another chapter in the saga of Bevill, Bresler & Schulman ("BBS"), a Livingston, New Jersey, securities dealer that went bankrupt during the mid–1980s, apparently due to massive fraud perpetrated by its officers. See, *e.g.*, Laurie Cohen & Herb Greenberg, *N.J. Securities Firm Goes Bankrupt: Oak Park S & L Owed $30 Million*, Chi. Trib., April 9, 1985, at Business p. 1; James Sterngold, *Bevill: Fast Growth Based on Repos*, N.Y. Times, April 10, 1985, at D1.

In this action the Resolution Trust Corporation ("the RTC"), as conservator for GreatAmerican Federal Savings and Loan Association ("GreatAmerican"), of Oak Park, Illinois, seeks approximately three million dollars from GreatAmerican's insurer, Aetna Casualty & Surety Company ("Aetna"), of Downer's Grove, Illinois, to cover part of GreatAmerican's 25 million dollar losses on account of the BBS bankruptcy. GreatAmerican first filed this action in state court in April 1987. After the RTC became conservator for GreatAmerican in February 1990, it removed the action to the United States District Court for the Northern District of Illinois pursuant to 12 U.S.C. §§ 1441a($l$)(1) and 1441a($l$)(3)(A). The RTC appeals the district court's grant of summary judgment in favor of Aetna, and its denial of summary judgment to the RTC. 831 F.Supp. 610. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

We review the grant of a motion for summary judgment *de novo*, viewing the facts and inferences therefrom in the light most favorable to the non-moving party. *Harris v. Bellin Memorial Hospital*, 13 F.3d 1082, 1083 (7th Cir.1994). Because no portion of GreatAmerican's losses are covered by the insuring agreements between GreatAmerican and Aetna, the decision of the district court is affirmed.

### Background

At issue in this case is Aetna's liability to the RTC, as conservator for GreatAmerican,

Wendi Sloane Weitman, Ray G. Rezner (argued), W. Scott Porterfield, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for plaintiff-appellant.

Francis D. Morrissey, Michael A. Pollard, Donna J. Williams, Donald J. Hayden, Thomas A. Doyle (argued), Baker & McKenzie, Chicago, IL, for defendant-appellee.

on account of GreatAmerican's losses stemming from two so-called "repo" and "reverse repo" transactions between GreatAmerican and BBS[1] in the mid–1980s. Whether Aetna is liable under the terms of the insuring agreements between it and GreatAmerican for some of GreatAmerican's losses depends in part upon whether these transactions were purchases and sales of securities or whether they were instead transactions "in the nature of a loan." Before addressing this question, we first provide a general description of repo and reverse repo transactions, a description of the particular transactions at issue in this case, and a discussion of the insuring agreements between Aetna and GreatAmerican.

### A. Repos and Reverse Repos

Repo (repurchase agreement) and reverse repo (reverse repurchase agreement) transactions involve the transfer of securities from one party to another in exchange for cash, with the simultaneous agreement between the parties that the second party will return the securities to the first party at a specified time in exchange for slightly more cash. The terminology employed for these transactions is that of purchase and sale: In the first part of the repurchase transaction (the exchange of the securities for cash) the first party is denominated the "seller" and the second, the "buyer" of the securities. In the second part of the transaction (the simultaneous agreement to repurchase) the second party, now the owner of the securities, promises to "sell" them back to the first party. Stip. 15;[2] *In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 566–67 (D.N.J. 1986). Despite this terminology, however, repurchase transactions are in many respects similar to collateralized loans, and the incremental difference between the sale price and the repurchase price is often called "interest." See, *e.g., In re Bevill*, 67 B.R. at 567.

The parties have three choices regarding custody of the underlying securities in a repurchase transaction, *In re Bevill*, 67 B.R. at 570–71:

(1) In a "possessory" (or "delivery") repurchase transaction the seller transfers the securities to the buyer or its agent at the outset of the transaction. The buyer is under no obligation to hold the securities until the date of resale. Rather, the buyer is free to transfer them to a third party in another repurchase transaction or in outright sale. "In practical effect, the [seller] relinquishes to the [buyer] all control over the security during the term of the [repurchase agreement]." *Id.* at 570. All that the buyer is obligated to do is to return the security or, if fungible, a security of equivalent value, at the date of resale.

(2) In a "non-possessory" (or "safekeeping") repurchase transaction the seller retains the securities for the account of the buyer. Because the transaction costs of a delivery repo are generally much greater than those of a safekeeping repo, *id.* at 608, and because many repurchase transactions are of relatively short duration, a nonpossessory repo is frequently preferable for the parties.

(3) In a "tripartite" repurchase transaction the securities are transferred to a third party that acts as agent for both buyer and seller.

Usually one of the participants in a repurchase transaction is a securities dealer and the other is an institutional customer such as a savings and loan. *Id.* at 568. When the purchase and sale is described from the point of view of the seller, it is called a repo. When it is described from the point of view of the buyer, it is called a reverse repo.

---

1. During the relevant time-period BBS had a corporate affiliate, Bevill, Bresler & Schulman Asset Management Corporation ("AMC"), that shared officers, employees and office space with BBS. The parties are agreed that in its dealings with the Bevill, Bresler & Schulman officers GreatAmerican thought it was transacting business with BBS, a securities broker-dealer registered with, and regulated by, the federal government. R. 51 at 11, 13; Pl.Br. at 5 n. 3; Def.Br. at 6. Unbeknownst to GreatAmerican, however, some of the deals were structured by the Bevill, Bresler & Schulman officers as transactions with AMC, a less-regulated entity. This opinion will refer to BBS and AMC collectively as the "Bevill entities."

2. The parties' joint stipulation of facts appears at R. 51 and will hereafter be referred to simply as "Stip."

Stip. 15, 16; *In re Bevill,* 67 B.R. at 567. The repurchase transactions discussed in this opinion will be described from the point of view of the dealer: When the dealer is the buyer/lender, the transaction will be called a reverse repo; when the dealer is the seller/borrower, the transaction will be called a repo.

Dealers utilize the services of clearing firms to facilitate the movement of securities and funds involved in repurchase transactions. Clearing firms provide such services as receipt and delivery of securities, payment for securities, and collection or transfer of funds for securities sold. Such transactions are accomplished through an account maintained by the clearing firm for the dealer (a "clearing account"). Clearing firms also provide financing for the dealers' repurchase transactions by making payment for delivered securities even if the dealer does not have sufficient funds on deposit with the firm to cover the deal. This financing is provided through a line of credit ("clearing loans") collateralized by securities owned by the dealers that are deposited in the dealers' clearing accounts. Stip. 18, 19; *In re Bevill,* 67 B.R. at 570.

Whether a repurchase transaction is structured as a possessory or a non-possessory one depends in part on whether the dealer is the buyer or the seller of the underlying securities. When GreatAmerican and the Bevill entities entered the transactions at issue in this case, reverse repos were generally structured as possessory transactions. The securities dealer, as "buyer" in the reverse repo, would obtain possession of the underlying security, but—as discussed above—was not obligated to retain physical possession of the security until the date of resale. Rather, the dealer was free to use that security in other repurchase transactions. *In re Bevill,* 67 B.R. at 570.

Repos, by contrast, were often structured as non-possessory transactions, due in part to the transaction costs associated with transferring possession of securities, and in part because the repos were frequently of short duration. The securities dealer, as "seller" in the repo, would retain the underlying security in safekeeping for the customer until the time of repurchase. Once again the dealer was not obligated to retain physical possession of the security that it was safekeeping for the buyer. Instead, the dealer would often utilize its clearing firm to hold the securities for the buyer until the time of repurchase. Clearing firms would provide segregation accounts for the safekeeping of securities that were fully paid for by the dealer's own customers and that were not to be used as security for the clearing loan provided by the firm to the dealer. Stip. 19; *In re Bevill,* 67 B.R. at 570–571.[3] These accounts were established pursuant to "omnibus safekeeping" arrangements, whereby one safekeeping account would be established to hold securities for all of the dealer's customers. The dealer, not the clearing firm, would be responsible for maintaining records regarding which of its customers owned which securities in the safekeeping account. Moreover, the clearing firm would act solely on instructions from, and on behalf of, the dealer to receive and deliver securities and funds. It ordinarily would have no relationship with the dealer's customers. In a tripartite repo transaction, however, the clearing firm would act on behalf of both the dealer and the dealer's customer in the transaction. *In re Bevill,* 67 B.R. at 571.

## B. *GreatAmerican's Repurchase Transactions*

In 1984 and 1985 GreatAmerican entered two repurchase transactions with the Bevill entities, a so-called "daily repo" and a "matched reverse repo/repo" transaction.

---

**3.** It seems that the dealer had considerable discretion to utilize even these securities on its own behalf: "[I]n a [non-possessory] repo, the dealer may commingle the purchaser's securities with its own securities during the day and use such securities to facilitate deliveries of securities to third parties if necessary." *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer*

*Savings & Loan Association,* 878 F.2d 742, 746 (3d Cir.1989). Thus the Treasury Department has recognized that non-possessory repos represent "the greatest potential for loss on the part of the investors since the securities purchased remain in the control of the seller." 52 Fed.Reg. 5671 (1987) (quoted in *Bevill, Bresler & Schulman,* 878 F.2d at 746).

In September 7, 1984 GreatAmerican entered into a five million dollar "daily repo" with BBS. The agreement provided that GreatAmerican, as the buyer of the securities, would sell them back to BBS on the next business day for slightly more than the original purchase price, hence the denomination "daily repo." As was customary, however, the parties contemplated that the repo would continuously "roll over" to the next business day until one of the parties terminated the series of repo transactions. Stip. 31, 32. The repo was non-possessory: BBS was to hold the securities in a safekeeping account at its clearing firm. Stip. 33. At the time the repo was agreed upon, BBS' clearing firm was Bradford Processing Services ("Bradford") in New York City. In February 1985 BBS transferred its clearing and safekeeping accounts from Bradford to Security Pacific Clearing and Services Corporation ("Security Pacific"), also in New York City. Stip. 20, 22, 23.

The daily repo was extended by the parties from September 1984 until AMC filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) in April 1985. Stip. 34, 36. At that time GreatAmerican discovered that its securities were not in BBS' safekeeping account with Security Pacific. Stip. 42.

In January 1985 GreatAmerican entered into a 34.4 million dollar "matched reverse repo/repo" with AMC. Stip. 24. Under the reverse repo, AMC bought two Federal Home Loan Mortgage Corporation participating certificates ("FHLMC certificates") from GreatAmerican for $34.4 million. Stip. 25. This price represented a 5% discount from the market price of the securities. Id. The reverse repo was possessory: AMC took possession of the FHLMC certificates and held them in its clearing account, first at Bradford and then, after February 1985, at Security Pacific. Stip. 28. GreatAmerican agreed to buy back the FHLMC certificates in six months' time for slightly more than $34.4 million. Stip. 24, 29.

Simultaneously, the parties entered into the matching repo. Under that agreement, AMC sold different securities to GreatAmerican for $34.4 million, and agreed to buy them

back in six months. Stip. 27. Because the "interest" that AMC agreed to pay in the matching repo was slightly higher than the "interest" that GreatAmerican agreed to pay in the reverse repo, the matched transactions were supposed to provide GreatAmerican with a 3.75% profit. Stip. 24, 27. The repo was non-possessory: AMC was to hold the securities that it had sold to GreatAmerican in its safekeeping account, first at Bradford and later at Security Pacific, until the date of repurchase. Pl. Br. at 10.

In addition to the facts that the parties stipulated regarding the daily repo and matched reverse repo/repo transactions, the record reveals other uncontested facts. (1) In these transactions, the initial sale price of the security was less than its market value at the time. Stip. 26. (2) In the reverse repo, wherein AMC "bought" two FHLMC certificates from GreatAmerican for a six month term, AMC "reserve[d] the right to request additional margin any time during the life of the agreement." R. 62, Ex. E. This "mark-to-market" provision allowed AMC to require GreatAmerican to provide it with additional securities if, during the term of the reverse repo, the market value of the FHLMC certificates fell below the agreed resale price. In re Bevill, 67 B.R. at 585. (3) In the daily repo and the matching repo transaction, wherein BBS and AMC "sold" securities to GreatAmerican that they were supposed to hold in safekeeping, the Bevill entities retained the "right of substitution." R. 62, Ex. D. This entitled the Bevill entities to substitute securities of equivalent value and quality for securities held in safekeeping in non-possessory repo transactions. In re Bevill, 67 B.R. at 590. (4) In all of these transactions, the agreed-upon repurchase price reflected an "interest" charge that was not related to the rate of return of the security itself, but rather reflected the current interest rates. R. 62, Ex. G at 16. (5) Maturing coupons remained the property of the original seller during the term of the transaction, and ownership of the securities was not re-registered in the name of the buyer. R. 62, Ex. D, E. (6) GreatAmerican's officers believed the repurchase transactions represented collateralized lending and borrowing, and

GreatAmerican's bookkeeping reflected this. R. 62, Ex. A.

The result of these transactions was as follows: In the daily repo, GreatAmerican transferred five million dollars to BBS in exchange for securities that BBS did not transfer to it. For the duration of the daily repo transactions, then, GreatAmerican had neither cash nor securities in its possession. GreatAmerican's expectation was that whenever it elected to stop rolling the repo over, BBS would repurchase the securities for five million dollars plus accrued interest.

In the matched reverse repo/repo transactions, GreatAmerican transferred possession of its FHLMC certificates to AMC in exchange for $34.4 million that AMC never transferred to it. Rather, GreatAmerican simultaneously purchased other securities from AMC in exchange for the same $34.4 million—securities that AMC also never transferred to it. Hence, for the six month term of the matched transaction GreatAmerican had neither cash nor securities in its possession. If all had gone well, at the end of the six months AMC would have repurchased the securities that it ostensibly held for GreatAmerican in safekeeping, and GreatAmerican would have used a portion of the resale proceeds to repurchase its FHLMC certificates from AMC. Thus at the end of the six months GreatAmerican would again have possession of its FHLMC certificates and it would have made a 3.75% profit on the deal.

All did not go well, however. After AMC filed for bankruptcy protection in April 1985, the SEC and the creditors of the Bevill entities discovered that BBS and AMC had suffered huge losses during the early 1980s due to speculative trading. To hide their insolvency, the entities had engaged in a pyramid scheme whereby securities that BBS and AMC held in non-possessory repos for the benefit of purchasers were not maintained in safekeeping accounts but rather were used in other repurchase transactions for the benefit of BBS and AMC. R. 55, Ex. C at ¶¶ 5, 7–11. BBS was eventually liquidated pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*, while AMC was reorganized pursuant to Chapter 11. Stip. 36, 38;

*In re Bevill,* 67 B.R. at 562. The officers of the Bevill entities were indicted for tax and securities fraud. R. 55, Ex. C.

During the bankruptcy proceedings GreatAmerican discovered that BBS and AMC were not holding any securities for it in their Security Pacific safekeeping accounts. Stip. 42, 43. Since all of the securities held in BBS and AMC's clearing accounts were treated as general assets of the estates, GreatAmerican never received the securities that it had "purchased" from AMC and BBS in the repo transactions. GreatAmerican also never received the securities that it had "sold" to AMC in the reverse repo. R. 43. As a result of the BBS/AMC bankruptcies, GreatAmerican sustained losses in excess of 25 million dollars on the daily repo and matched reverse repo/repo transactions. Pl. Br. at 12.

## C. The Bond

In November 1983 Aetna issued an industry-standard Savings and Loan Blanket Bond (the "Bond") to GreatAmerican. Stip. 3. The Bond was in effect during the transactions between GreatAmerican and the Bevill entities and at the start of the bankruptcy proceedings. It provided for coverage of up to three million dollars after a deductible of $25,000. Stip. 4. The parties agree that only two of the insuring agreements, Insuring Agreement (B) and Insuring Agreement (E), and two of the exclusions, Exclusion 2(e) and Exclusion 2(i), in that Bond are relevant to this case.

Under the relevant portion of Insuring Agreement (B), titled "On Premises," Aetna agreed to indemnify GreatAmerican for (Stip. 6):

(1) Loss of Property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof while the Property is lodged or deposited within offices or premises located anywhere, or

(b) theft, false pretenses, common law or statutory larceny committed by a person

(i) present in an office of, or on the premises of, the Insured, or

(ii) present on the premises in which the Property is lodged or deposited.

Under the Insuring Agreement (E), titled "Securities," Aetna agreed to indemnify GreatAmerican for (R. 51, Ex. 1):

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a) Security,

(b) Document of Title,

(c) deed, mortgage, or other instrument conveying title to, or creating or discharging a lien upon, real property,

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

which

(i) Bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety guarantor, or of any person signing in any other capacity which is a Forgery, or

(ii) is altered, or

(iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (g) above;

(3) acquired, sold or delivered, or given value, extended credit, or assumed liability, on the faith of, or otherwise acted upon, any items listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent institution or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

The Insuring Agreements were subject to a number of exclusions. Section 2(e) of the Bond excludes coverage for (Stip. 8):

loss resulting directly or indirectly from complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt ... except when covered under Insuring Agreements (A), (D), or (E).

Section 2(i) of the Bond excludes coverage for (Stip. 9):

loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured or any customer's account, actual or fictitious ... except when covered under Insuring Agreements (D) or (E).

Exclusion 2(e) (the "Loan–Loss Exclusion") and Exclusion 2(i) (the "Trading–Loss Exclusion") apply by their terms to claims under Insuring Agreement (B) but not to claims under Insuring Agreement (E).

The RTC argues that GreatAmerican's losses are covered by either or both of Insuring Agreements (B) and (E). With respect to Insuring Agreement (B), the "On Premises" agreement, the RTC's position is as follows:. When BBS and AMC improperly moved GreatAmerican's securities from their safekeeping accounts into their clearing accounts, utilizing the securities both in other deals and to collateralize clearing loans from Bradford and Security Pacific, BBS and AMC "misplaced" GreatAmerican's securities (because they deliberately placed the securities in the wrong place), and hence GreatAmerican suffered "Loss of Property resulting directly from ... misplacement" under the Agreement. Moreover, because BBS and AMC essentially defrauded GreatAmerican out of its securities, it suffered "Loss of

Property resulting directly from ... theft, false pretenses, or larceny" under that same Agreement. The RTC argues that neither the Loan–Loss Exclusion nor the Trading–Loss Exclusion apply to this situation.

With respect to Insuring Agreement (E), the "Securities" agreement, the RTC's position is that it applies to the theft of securities, that these securities were clearly stolen, and that Aetna is therefore liable to reimburse GreatAmerican. The RTC argues that GreatAmerican satisfied the condition precedent of this Agreement, actual physical possession of the securities, because Bradford, the clearing firm for the Bevill entities at the time the deals were entered, was GreatAmerican's "authorized representative" within the meaning of the Agreement and Bradford had possession of the securities.

Aetna, on the other hand, argues that there is no coverage under either Insuring Agreement (B) or Insuring Agreement (E). Without conceding that GreatAmerican's losses fall within the scope of the Insuring Agreement (B), the "On Premises" agreement, Aetna argues that they clearly fall within the Loan–Loss Exclusion to that Agreement because the repurchase transactions were "in the nature of a loan." Aetna also argues that GreatAmerican's losses are not covered under Insuring Agreement (E), the "Securities" agreement, because that Agreement covers securities that have defects in title at the time of acquisition, not securities that are stolen after the insured has taken possession of them. Since the securities at issue in this case had no defects in title when GreatAmerican "bought" them, Aetna argues that the Agreement is inapplicable. Aetna suggests that under the RTC's reading of Insuring Agreement (E), that Agreement would be indistinguishable from Insuring Agreement (B), except that it would not be subject to the Loan–Loss and Trading–Loss Exclusions that apply to Insuring Agreement (B). Aetna also argues that to the extent that Insuring Agreement (E) could be read to cover this type of loss, GreatAmerican did not satisfy the condition precedent for coverage, actual physical possession of the securities.

*Analysis*

Because GreatAmerican's losses were not covered either by Insuring Agreement (B) or by Insuring Agreement (E), summary judgment in favor of Aetna is proper.

### A. Insuring Agreement (B)

The "On Premises" agreement applies to "Loss of Property resulting directly from ... misplacement ... while the Property is lodged or deposited within offices or premises located anywhere," and to "Loss of Property resulting directly from ... theft, false pretenses, common law or statutory larceny committed by a person ... present on the premises in which the Property is lodged or deposited." This Agreement is subject to both the Loan–Loss and the Trading–Loss Exclusions.

While it is by no means clear that GreatAmerican suffered, as the RTC argues, "Loss of Property resulting directly from ... misplacement" or "resulting directly from ... theft, false pretenses, or larceny," it is absolutely clear that GreatAmerican's losses fall squarely within the Loan–Loss Exclusion. For this reason we need not address whether, were it not for the Loan–Loss Exclusion, GreatAmerican's losses would fall within the language of Insuring Agreement (B), nor need we address whether the Trading–Loss Exclusion provides an independent ground for Aetna to deny coverage. The Loan–Loss Exclusion serves to preclude the RTC from recovering under Insuring Agreement (B).

The Loan–Loss Exclusion excludes coverage under, *inter alia*, Insuring Agreement (B) for "loss resulting directly or indirectly from complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower...." In this case GreatAmerican's losses resulted from the failure of the Bevill entities to return its securities in the repurchase transactions. If these transactions were "in the nature of a loan," then GreatAmerican's losses are excluded from coverage under Insuring Agreement (B).

The RTC's principal argument that the repurchase transactions were not in the nature of a loan is that the parties structured those transactions as purchases and sales, and thereby evidenced an intent that they be purchases of securities and not loans. It also notes that the bankruptcy court, for this very reason, treated the repurchase transactions in the Bevill, Bresler & Schulman bankruptcies as purchases and sales and not as collateralized loans. *In re Bevill*, 67 B.R. at 597–98. This reasoning misses the mark, however, for the issue here is not whether the parties to the repurchase transactions (GreatAmerican and the Bevill entities) intended them to be loans or purchases, but rather is whether the parties to the insuring agreements (GreatAmerican and Aetna) intended that losses stemming from repurchase transactions be covered under Insuring Agreement (B). The language of the Loan–Loss Exclusion, which broadly excludes from coverage losses resulting from default upon any transaction "in the nature of a loan," clearly indicates that whether a particular transaction falls within the exclusion is determined by its economic substance, not by the labels attached to it by the insured and third parties *dehors* the insuring agreement.

Whether a particular repurchase transaction is in economic substance more like a sale or more like a loan depends on the structure of that transaction. *First Federal Savings & Loan Association of Toledo v. Fidelity and Deposit Co. of Maryland*, 895 F.2d 254, 260 (6th Cir.1990). For the following reasons we conclude that each repurchase transaction at issue here was in economic substance, if not in terminology, a collateralized loan and not a purchase and sale of securities: First, the repurchase and reverse repurchase agreements set forth specific maturity dates, settlement dates for repayment of funds, and specific rates of interest to be paid at the time of settlement. Second, the rate of in-

terest on the repos and reverse repos had no relation to the interest rate on the underlying security. Third, the initial "purchase price" of the securities in the repurchase transactions did not reflect their full market value. Fourth, principal and interest payments on the securities underlying these transactions continued to be paid to the original owner during the term of the repurchase transaction, not to the "purchaser." Fifth, ownership of the underlying securities was not reregistered in the buyer during the term of the agreement. Sixth, in the reverse repurchase transaction AMC, as the "buyer" of the FHLMC certificates, was entitled to request additional margin any time during the life of the agreement. Likewise, in the repo transactions the Bevill entities, as the "seller" of the securities held in safekeeping, were entitled to substitute other securities for those that they had actually "sold" to GreatAmerican. Cf. *First Federal*, 895 F.2d at 260 (discussing factors that indicate whether a repurchase transaction is in substance a sale or a loan); *In re Bevill*, 67 B.R. at 587–89, 597 (same).[4]

These factors demonstrate that the economic substance of each repurchase transaction was collateralized lending: Because the market value of the underlying securities exceeded their "sale" value in the repurchase agreement, the buyer/lender (GreatAmerican in the repo transactions, and AMC in the reverse repo) was essentially over-collateralized during the term of the transaction. Moreover, AMC as the buyer in the reverse repo could require GreatAmerican to put up additional collateral if the value of the underlying securities dropped during the term of the agreement, ensuring that AMC would, at the very least, remain sufficiently collateralized during the term of the transaction. On the other hand, the Bevill entities as the sellers in the repos could substitute other securities as collateral for the loan provided

---

4. The *First Federal* court did not reach the question whether the transactions at issue in that case were "in the nature of a loan" because it held that the district court had not determined whether the losses incurred by the bank resulted from a default upon any "note, account, agreement or other evidence of debt," and hence were excluded under the insuring agreement. 895 F.2d at 259, 260. In the case at bar the Loan–Loss Exclusion excludes both loss resulting from default upon any transaction "in the nature of a loan" and loss resulting from default upon any "accounts, invoices, notes, agreements or Evidences of Debt." Under the reasoning of the *First Federal* court, then, GreatAmerican is not covered under Insuring Agreement (B) because the Loan–Loss Exclusion applies.

by GreatAmerican if the value of the underlying securities increased during the term of the agreement, ensuring that they would not miss an opportunity to benefit from the use of the underlying securities. Additionally, the seller in all of these transactions (the Bevill entities in the repo transactions, and GreatAmerican in the reverse repo) retained many indicia of ownership during the term of the agreement, including record ownership and the right to receive payments on the securities. While other aspects of the transactions were more similar to outright sale than to collateralized lending—in particular, AMC as the buyer of the securities in the reverse repos was allowed to benefit by their use in ways that a lender in possession of collateral generally is not—we hold that the aspects of the daily repo and the matched reverse repo/repo that make them similar in substance to collateralized lending far outweigh the aspects that make them similar to outright sales.

In substance, these transactions represented unwise lending and borrowing practices on the part of GreatAmerican. When it lent money, it neglected to protect its collateral; when it borrowed, it gave the lender far greater rights in the collateral than was prudent.[5] The possibility that GreatAmerican would lose money on account of its lending and borrowing practices is a risk that it and Aetna explicitly excluded from coverage under Insuring Agreement (B). The Bond "is not a form of credit insurance." *French American Banking Corp. v. Flota Mercante Grancolombiana*, 752 F.Supp. 83, 88 n. 5 (S.D.N.Y.1990) (citation and internal quotation marks omitted), affirmed, 925 F.2d 603 (2d Cir.1991). For the purposes of the Bond, the risk that GreatAmerican would suffer a loss on account of the repurchase transactions at issue here is a risk that Aetna and GreatAmerican negotiated out of coverage under Insuring Agreement (B).

The conclusion that some repurchase transactions are "in the nature of a loan" for the purposes of the Loan–Loss Exclusion, because they are in economic substance collateralized lending, finds substantial support in caselaw. See, *e.g., Warner v. Zent*, 997

F.2d 116, 120–21 (6th Cir.1993) (rehearing state court discussion of certain reverse repurchase agreements that "represented collateralized borrowings" and discussing *State v. Warner*, 55 Ohio St.3d 31, 564 N.E.2d 18, 22 n. 2 (1990), certiorari denied, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649), certiorari denied, —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78; *United States v. Manko*, 979 F.2d 900, 902 (2d Cir.1992) (noting that "[i]n effect, a repurchase agreement is a loan in the amount of the proceeds of the original sale, collateralized by [the security], with interest equal to the difference between the sale and the repurchase prices"), certiorari denied, —— U.S. ——, 113 S.Ct. 2993, 125 L.Ed.2d 687; *In re Comark*, 971 F.2d 322, 323 (9th Cir.1992) (observing that "Reverse Repos can function as a loan.... [T]he securities 'sold' to the dealer can be viewed as ... collateral"); *In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 55 (3d Cir.1990) (acknowledging that while repurchase agreements have been characterized as nothing more than contracts for the purchase and sale of securities for the purposes of determining the rights of creditors vis-a-vis a trustee in bankruptcy, "[t]here is no question ... that repurchase agreements also closely resemble secured loans"); *United States v. Serrano*, 870 F.2d 1, 3 (1st Cir.1989) (observing that "[a] REPO is essentially a short-term loan agreement whereby the lender loans money to a borrower in return for collateral such as securities owned by the borrower"); *Marx v. Centran Corp.*, 747 F.2d 1536, 1539 (6th Cir.1984) (characterizing repos as short-term secured loans), certiorari denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273; *In re Legel, Braswell Government Securities Corp.*, 648 F.2d 321, 324 n. 5 (5th Cir.1981) (commenting that "a ... repo 'is essentially a short-term collateralized loan' although it is in the form of a sale" (quoting *Securities & Exchange Comm'n v. Miller*, 495 F.Supp. 465, 467 (S.D.N.Y.1980)); *United States v. Erickson*, 601 F.2d 296, 300 n. 4 (7th Cir.1979) (observing that a repurchase agreement is in substance a secured loan), certiorari denied, 444 U.S. 979, 100 S.Ct. 480, 481, 62 L.Ed.2d 406.

---

5. See *supra* note 3.

All of the foregoing cases agree that repurchase transactions have many of the characteristics of, and frequently serve the economic function of, secured loans. That some cases treat the purchase and sale aspect of these transactions as controlling in certain legal contexts [6] does not vitiate the general observation concerning their economic substance.

Our conclusion that the repurchase transactions here were "in the nature of a loan" is bolstered by the undisputed evidence that GreatAmerican's officers believed these transactions to be loans and treated them as such in the bank's records. This evidence indicates that whatever the parties to the repurchase transactions intended them to be—for the RTC argues that GreatAmerican and the Bevill entities intended them to be purchases and sales, and not collateralized loans—GreatAmerican recognized that they were in economic substance collateralized loans.

Because the repurchase transactions at issue here were "in the nature of a loan," the Loan–Loss Exclusion serves to remove them from coverage under Insuring Agreement (B).

### B. Insuring Agreement (E)

■ The "Securities" agreement applies to "Losses resulting directly from the Insured having, in good faith ... acquired ... any original ... security ... which ... is lost or stolen." A condition precedent to coverage under Insuring Agreement (E) is "actual physical possession" of the security at issue. While it is by no means clear that the RTC is correct in its position that GreatAmerican satisfied the condition precedent, it is clear that the Agreement does not apply to losses such as GreatAmerican suffered in this case. Insuring Agreement (E) applies to losses

resulting from the acquisition of, *inter alia,* securities that have a defect in title at the time of acquisition, and not to securities that are stolen after the insured has taken possession of them. For this reason we need not discuss whether Bradford's possession of the securities somehow constituted "actual physical possession" of the securities by an "authorized representative" of GreatAmerican. Because the securities were stolen after GreatAmerican "took possession" of them (according to the RTC), and they had—as far as we know—no defect in title at the time the repurchase agreements were entered, GreatAmerican is not covered under the terms of the Agreement.

The dispute between the parties regarding Insuring Agreement (E) is whether the "is lost or stolen" language applies to a security that is stolen after the insured acquires it, or whether it applies only to a security that is a stolen security at the time of acquisition. It is clear that this language, when read in its context, applies only to securities that have a defect in title at the time of acquisition. Cf. *Bank of the Southwest v. National Surety Co.,* 477 F.2d 73, 77 (5th Cir.1973) ("To recover for a loss on any documents which are 'stolen,' within the meaning of Coverage E of the Bond, the Bank must be in a situation where it could be required to give up the allegedly stolen document to the rightful owner.") (The entire Agreement is reproduced at pages 575–76, *supra* ). First, the Agreement, taken as a whole, covers risks involving the genuineness and negotiability of certain items, among them securities, at the time of acquisition, and not risks of occurrences after acquisition. Second, the other risks enumerated in the subsection where the "is stolen" language appears are clearly risks concerning defects in title at the time of acquisition, and not risks of later occurrenc-

---

**6.** See, *e.g., In re Comark,* 145 B.R. 47, 53 (9th Cir. Br.App. Panel 1992) (agreeing with lower bankruptcy courts that the objective intent of the parties to structure repurchase transactions as purchases and sales is controlling for bankruptcy purposes, despite the economic substance of the transactions); *Bevill, Bresler & Schulman,* 878 F.2d at 745 (accepting the bankruptcy court's characterization of repos and reverse repos as purchases and sales of securities); *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,*

801 F.2d 13, 19 (2d Cir.1986) (holding that for the purposes of the antifraud provisions of federal securities law, repurchase transactions are contracts to buy, purchase, or otherwise acquire securities), certiorari denied, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001; *In re Bevill,* 67 B.R. at 597 (holding that the intent of the parties to the transaction, as indicated by its structure as a purchase and sale, and not an evaluation of its economic content, controls its characterization in bankruptcy).

es. Third, the conditions precedent to coverage under this Agreement—that the insured have had "actual physical possession" of the security and that the insured acquired the security "in good faith"—are sensible under Aetna's reading of the Agreement and are meaningless under the RTC's reading. Finally, to read this Agreement as the RTC urges is in effect to replicate the coverage of Insuring Agreement (B), only without the Loan–Loss Exclusion or the Trading–Loss Exclusion.

Our interpretation of Insuring Agreement (E) finds support in caselaw. Cf. *Republic National Bank of Miami v. Fidelity and Deposit Co. of Maryland,* 894 F.2d 1255, 1263 (11th Cir.1990) (in order to recover on a forged document under Insuring Agreement (E) the insured must have relied on the forgery), certiorari denied, 498 U.S. 926, 111 S.Ct. 308, 112 L.Ed.2d 261; *United Bank & Trust Co. of Norman, Oklahoma, v. Kansas Bankers Surety Co.,* 901 F.2d 1520, 1524 (10th Cir.1990) (loss under a similar agreement occurs at the time money is exchanged for valueless securities, not at the time the loss is discovered). The only case cited by the parties, or discovered by this Court, that precisely addresses the temporal aspect of coverage under Insuring Agreement (E)— that is, whether it applies to securities that are stolen after the insured acquires or otherwise acts upon them, or whether it applies only to securities that are stolen securities at the time of acquisition—is *Exeter Banking Co. v. New Hampshire Insurance Co.,* 121 N.H. 1083, 438 A.2d 310 (1981), which squarely held that the Agreement did not cover losses resulting from securities being stolen after the bank had "acted upon" them. The RTC argues that because the language at issue in that case differs slightly from the language at issue here, a different result is required in the case at bar. We disagree. Apparently only one litigant other than the RTC has even suggested that Insuring Agreement (E) would cover losses such as GreatAmerican suffered in this case, and that litigant lost on summary judgment. That the RTC is virtually alone in its interpretation of Insuring Agreement (E) only reinforces our belief that the RTC's position is untenable.

Because the securities at issue here were stolen after GreatAmerican "took possession" of them (according to the RTC), GreatAmerican's losses are not covered by Insuring Agreement (E).

### Conclusion

The parties agree that if Aetna is liable to the RTC for GreatAmerican's losses in the repo and reverse repo transactions with the Bevill entities, it is under either Insuring Agreement (B) or Insuring Agreement (E). The district court correctly determined that neither agreement applies to the facts of this case. For the foregoing reasons, the grant of summary judgment in favor of Aetna is affirmed.