REVISED MARCH 19, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 01-51135

---

PERFORMANCE AUTOPLEX II LTD; PERFORMANCE FORD LP

Plaintiffs - Appellants

v.

MID-CONTINENT CASUALTY COMPANY

Defendant - Appellee

---

Appeal from the United States District Court
for the Western District of Texas, San Antonio

---

February 20, 2003

Before KING, Chief Judge, and JOLLY and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Plaintiffs-Appellants Performance Autoplex II Ltd. and Performance Ford, L.P. filed suit against Defendant-Appellee Mid-Continent Casualty Company, alleging that Mid-Continent improperly refused to pay for employee dishonesty losses covered by one of its insurance policies. The district court granted summary judgment in favor of Mid-Continent on all claims and Performance Autoplex and Performance Ford appeal. We affirm in part, reverse in part, and remand.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  Facts

Performance Automotive Group, Inc. ("Performance Group")

operates new car dealerships in Texas and other states. Performance Autoplex II Ltd. ("Performance Autoplex") and Performance Ford, L.P. ("Performance Ford") are two separate dealerships; both are general partners of Performance Group.

In 1995 or 1996, Michael Avellar, Vice-President of Performance Group, contacted McKane Morgan & Associates ("McKane Morgan") to purchase insurance to cover inventory losses discovered during annual parts inventories. Abbie Morgan, a McKane Morgan employee, told Avellar that Performance Group could obtain coverage from Mid-Continent Casualty Company ("Mid-Continent") that would cover inventory losses if there was some evidence of criminal activity by an employee. Avellar purchased a Mid-Continent commercial insurance package from McKane Morgan. The package included a commercial crime coverage policy, which contained a provision covering losses caused by employee dishonesty. The policy covers "loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss." Under the policy, Covered Property is "'[m]oney', 'securities', and 'property other than money and securities'" and the Covered Cause of Loss is "[e]mployee dishonesty." Performance Autoplex and Performance Ford were named insureds under the policy. The policy was renewed in 1997.[1]

---

[1] When it came time to renew the policy, Avellar asked E.R. McKane and Morgan if the new policy contained any variances from prior coverage. McKane and Morgan advised Avellar of variances from prior coverage, but none of the variances affected employee dishonesty coverage.

**Pigg Inventory Loss Claim**

In 1997, Performance Autoplex, a dealership in Midland, Texas, undertook an annual physical inventory of its parts department. During the inventory, Performance Autoplex discovered that its Parts Manager, Mike Pigg, had stolen parts and cash from the department. The dealership's ledger showed a total inventory discrepancy of approximately $115,000. Pigg admitted to stealing approximately $4,000 in cash and parts valued at between $25,000 and $30,000.

Performance Autoplex submitted a claim to Mid-Continent for the entire amount of the inventory shortage. Mid-Continent had an outside accounting firm, Campos & Stratis, L.L.P. ("Campos & Stratis"), investigate the claim and verify the amount of the loss. Campos & Stratis identified an inventory shortage of $115,752 and traced $47,222 to parts stolen by Pigg. Campos & Stratis also identified a cash shortage of $5,643 and traced that amount to Pigg. After taking shrinkage[2] into account, Campos & Stratis determined that Performance Autoplex's loss, exclusive of the cash shortage, totaled between $95,335 and $105,544.[3]

Mid-Continent paid $52,865, $5,643 for cash stolen by Pigg

---

[2] Shrinkage is an industry term to account for expected changes in inventory due to factors such as improper data entry, theft, or breakage. Campos & Stratis assumed a shrinkage value of 1% to 2% of gross parts sales which amounted to approximately $10,000 to $20,000 per year.

[3] The amount of loss varied based on which rate of shrinkage was used.

and $47,222 for parts that could be specifically traced to Pigg. Mid-Continent denied the remainder of the claim, stating that the policy's "inventory computation" exclusion barred payment of the amount that would be required to reconcile the value of the physical inventory with the inventory listed in the dealership's general ledger.[4]  Mid-Continent reasoned that because there was no evidence tracing Pigg to approximately half of the claimed loss, the amount of the loss could only be substantiated using an inventory computation, which the policy forbids.

**Wall Trade-In Claim**

In March 1998, Sheilah Wall, the controller at Performance Ford, a dealership in Memphis, Tennessee, transferred title in a new Ford Taurus to her mother.  Though this transfer was purportedly in exchange for a $2,000 down payment and trade-in of a 1997 Ford Taurus, neither the down payment nor the trade-in was ever received.

Performance Ford submitted a claim for this loss to Mid-Continent, requesting payment for the $2,000 down payment and the value of the trade-in vehicle (approximately $12,700).  Mid-Continent reimbursed Performance for the $2,000 down payment but

---

[4]     The inventory computation exclusion states:

1. Additional Exclusions: We will not pay for losses as specified below:
. . .
     b. Inventory Shortages: loss, or that part of any
     loss, the proof of which as to its existence or
     amount is dependent upon:
          (1) An inventory computation; or
          (2) A profit and loss computation.

not for the value of the trade-in vehicle.  In explaining why it denied the claim, Mid-Continent stated that the loss was not one due to "employee dishonesty" because "[i]t is clear that the dealership knew [it] did not have the trade in vehicle."  Mid-Continent later claimed that the loss was barred by the "indirect loss" policy exclusion.[5]  Mid-Continent further suggested that because Performance Ford never claimed that the loss was the value of the new car, but only that it was the value of the trade-in vehicle (proven only by the dishonest employee's assessment of the vehicle's value), Performance Ford has not shown there was a covered loss.

**Wall Unauthorized Pay Increase Claim**

In December 1997, Sheilah Wall embezzled funds from Performance Ford by giving herself and another employee unauthorized pay increases.  Though these raises should have been approved by Performance Ford's general partner and general manager, Wall never sought such approval.  In total, Wall obtained $19,724 in extra pay for herself and another employee.

Performance Ford submitted a claim for this loss to Mid-

---

[5]     The indirect loss exclusion reads:

A. GENERAL EXCLUSIONS: We will not pay for loss as specified below:
. . .
    3. Indirect Loss: Loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:
        a. Your inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.

Continent.  Mid-Continent denied the claim, claiming the loss did not result from "employee dishonesty" because the benefit received was a salary increase.  The employee dishonesty provision reads as follows:

> 3. Additional Definitions
>     a. "Employee Dishonesty" in paragraph A.2 means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:
>         (1) Cause you to sustain loss; and also
>         (2) Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:
>             (a) The "employee"; or
>             (b) Any person or organization intended by the "employee" to receive that benefit.

According to Mid-Continent, there was no "employee dishonesty" loss because the policy specifically excludes fraudulently obtained salaries.

## B.    Procedural History

Performance Autoplex and Performance Ford (collectively "Performance") filed suit in Texas state court, seeking breach of contract damages for Mid-Continent's denial of their three claims.  Performance also asserts extracontractual claims for three violations of the Texas Insurance Code, claiming that Mid-Continent: (1) misrepresented the scope of policy coverage; (2) denied Performance's claims in bad faith; and (3) improperly denied Performance's claims, even if there was no bad faith, so that statutory penalties are due.  Mid-Continent removed the case to federal district court.

Both Performance and Mid-Continent filed motions for summary judgment.[6]  The district court referred the matter to a magistrate judge, who recommended that Performance's motion be denied and Mid-Continent's motion be granted.  Performance filed objections to the magistrate judge's report and filed a motion to supplement the record.  The district court conducted an independent review of the record and a de novo review of those portions of the report to which Performance objected.  The district court then adopted the magistrate judge's report, granted Mid-Continent's motion for summary judgment, and denied Performance's motion for summary judgment and motion to supplement the record.

On the Pigg inventory claim, the district court agreed with Mid-Continent that the policy's "inventory computation" exclusion barred Performance's claim as a matter of law because the claim could only be substantiated through an inventory.  On the Wall trade-in claim, the district court found that the "indirect loss" exclusion barred Performance's claim as a matter of law.  The district court reasoned that because Performance had not substantiated the value of the new car or the trade-in vehicle, it was only claiming a loss of its profit on the trade-in vehicle.[7]  On the Wall pay increase claim, the district court

---

[6]     The district court initially denied both motions without prejudice and referred the matter to mediation.  After no settlement came from mediation, both parties re-urged their motions for summary judgment.

[7]     The district court also suggested that there was no covered loss because Performance eventually wrote off the loss.

determined that the unauthorized salary increase was not covered "employee dishonesty" as a matter of law under the plain language of the policy.  Finally, the district court ruled for Mid-Continent on Performance's Texas Insurance Code claims because there had not been a misrepresentation and Mid-Continent properly denied all of the claims.

Performance appeals the grant of Mid-Continent's motion for summary judgment, the denial of its motion for partial summary judgment, and the denial of its motion to supplement the record. Specifically, Performance raises seven issues for our review: (1) whether the district court erred in granting Mid-Continent summary judgment on the Pigg inventory claim; (2) whether the district court erred in granting Mid-Continent summary judgment on the Wall trade-in claim; (3) whether the district court erred in granting Mid-Continent summary judgment on the Wall salary increase claim; (4) whether the district court erred in granting Mid-Continent summary judgment on the misrepresentation claim; (5) whether the district court erred in granting Mid-Continent summary judgment on the bad-faith coverage denial claim; (6) whether the district court erred in granting Mid-Continent summary judgment on the claim for statutory penalties; and (7) whether the district court erred in denying Performance's motion to supplement the record.

## II.  STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo, applying the same standards as the district court.  Daniels v.

City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 534 U.S. 951 (2001). Summary judgment should be granted if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining if there is a genuine issue of material fact, this court reviews the evidence in the light most favorable to the non-moving party. Daniels, 246 F.3d at 502. We may affirm summary judgment on any legal ground raised below, even if it was not the basis for the district court's decision. See In re Williams, 298 F.3d 458, 462 & n.5 (5th Cir. 2002).

An interpretation of an insurance policy provision is an issue of law reviewed de novo. See Am. States Ins. Co. v. Bailey, 133 F.3d 363, 369 (5th Cir. 1998). This is a diversity case and the parties agree that Texas insurance law applies. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-79 (1938). Texas courts interpret insurance policies using the rules of interpretation and construction generally applicable to other contracts. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). Generally, an insured bears the burden of showing that a claim against an insurer is within the policy's coverage. See Sentry Ins. v. R.J. Weber Co., 2 F.3d 554, 556 (5th Cir. 1993) (interpreting Texas law). An insurer has the burden of establishing that an exclusion applies. See id.; see also Tex. Ins. Code Ann. art. 21.58(b) (Vernon 1981 & Supp. 2003). If a provision in an insurance contract can be given a definite and

certain meaning, then the provision is not ambiguous.  See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 907 S.W.2d at 520.  Mere disagreement over the interpretation of a provision does not make the provision ambiguous or create a question of fact.  See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am., 957 F.2d 196, 199 (5th Cir. 1992) (interpreting Texas law).  If an ambiguity exists, the policy should be interpreted in favor of the insured.  See, e.g., Toops v. Gulf Coast Marine Inc., 72 F.3d 483, 486 (5th Cir. 1996) (interpreting Texas law).

A district court's denial of a motion to supplement the record after a magistrate judge recommended granting or denying summary judgment is reviewed for an abuse of discretion.  See Freeman v. County of Bexar, 142 F.3d 848, 851-53 (5th Cir. 1998).

### III.  DISCUSSION

#### A.  Pigg Inventory Loss Claim

First, we address whether the district court properly granted Mid-Continent's motion for summary judgment and denied Performance's motion for partial summary judgment on the Pigg inventory claim.

Performance argues that it suffered a covered loss and that the "inventory computation" exclusion does not apply. Performance first contends that its made out its prima facie case because the fact that Pigg caused some of the loss raises the inference that he is responsible for the entire loss.  Next, Performance argues that the inventory performed in this case is not an inventory computation as a matter of law because it was a

physical inventory that did not involve estimation or account comparison.[8]  Performance also argues that under the policy, an inventory computation may be used to quantify a loss once there is independent proof that employee dishonesty caused the loss.

Mid-Continent disputes that it should pay the portion of the Pigg loss at issue.  Mid-Continent initially contends that Performance did not come forward with sufficient evidence to show that the Pigg claim was a covered "employee dishonesty" loss. Alternatively, Mid-Continent argues that, even if Performance showed the loss was due to employee dishonesty, the loss is excluded because the method used to quantify the loss is an "inventory computation."

The district court granted summary judgment in favor of Mid-Continent.  The district court did not address whether Performance showed the loss was due to employee dishonesty, though Mid-Continent made this argument, but instead determined that the "inventory computation" exclusion barred coverage.[9] Because Performance could not trace the disputed portion of its losses to Pigg but could only estimate these losses using its annual inventory, the district court denied coverage.

We do not address the "inventory computation" exclusion because we conclude that Performance has not made out its prima

---

[8]     Alternatively, Performance argues that the term "inventory computation" is ambiguous and that we should thus adopt a definition that favors coverage.

[9]     The district court interpreted the exclusion to mean: "[w]hen the existence or amount of a claim is derived from an inventory, the exclusion bars recovery of that amount."

facie showing that it suffered a covered loss due to "employee dishonesty." Put simply, Performance has not provided sufficient evidence to create a genuine issue of material fact that Pigg caused the loss at issue. It is Performance's burden to show that coverage applies. The policy requires that Performance show "loss of . . . Covered Property resulting directly from the Covered Cause of Loss [employee dishonesty]." Campos & Stratis specifically tied about half of the loss, $5,643 in cash and $47,222 in parts, to Pigg. The Campos & Stratis report is fortified by Pigg's own admission that he took approximately $4,000 in cash and approximately $25,000 to $30,000 in parts. Performance offers only two other pieces of evidence to tie Pigg to the remainder of the loss: (1) the inference that the loss must have been caused by Pigg because Performance had not determined any other potential cause and (2) the fact that Pigg, as Parts Department Manager, could have stolen more than he admitted and generated false sales invoices that would make the stolen parts untraceable.[10] Performance does not provide evidence to back up these two suggestions. Pigg admitted, and Campos & Stratis verified, the details of several transactions he used to defraud Performance. For example, Pigg explained how he sold parts to Dugan's Body Shop for which he was paid in cash, how he kept the cash rather than turning it in to Performance,

---

[10] Performance bases its second argument on Campus & Stratis's conclusory statement that Pigg "was able to remove inventory without supervision and generate false sales invoices; thereby rendering the items stolen untraceable."

and how he manipulated inventory records to cover the loss.  Pigg provided similar detail for each of his other fraudulent transactions.  When asked about the remaining, un-accounted for amount, Pigg said, "I can't tell you where the rest of it went but I know what I've told you is what I know about."  All Performance relies on to prove its prima facie case is Pigg's admission, the Campos & Stratis report, and the inventory discrepancy.  Even if the inventory discrepancy could be used to substantiate the amount of the loss under the "inventory computation" exclusion (an issue we do not reach), there is no evidence, direct or circumstantial, that Pigg caused that portion of the loss.  Without some evidence linking Pigg to the loss, Performance cannot withstand summary judgment.  We affirm the district court on this issue.

### B.   Wall Trade-In Claim

We next consider whether the district court erred in granting Mid-Continent's motion for summary judgment and denying Performance's motion for partial summary judgment on the Wall trade-in claim.

Performance contends that its loss is a covered loss as a matter of law and that the indirect loss exclusion does not bar coverage for the trade-in loss.  Mid-Continent first argues that Performance did not show the trade-in loss was an "employee dishonesty" loss because the transaction was just a bad business deal, not a loss due to Wall's dishonesty.  Mid-Continent also argues that Performance has not shown a loss of "covered

property" because it has not set forth evidence of the value of the trade-in vehicle.[11]  Finally, Mid-Continent argues that the indirect loss exclusion bars coverage on this claim.

The district court rejected Mid-Continent's argument that the trade-in was not within the employee dishonesty coverage, but then found that the loss was excluded under the "indirect loss" exclusion.[12]  The district court agreed with Mid-Continent that "the figure of $12,700.00 [the value attached to the trade-in vehicle in the new car purchase contract] represents the benefit of the bargain, including profit, that [Performance] would have made on the trade-in deal."

We need not reach the "indirect loss" exclusion or the issue of whether there was "employee dishonesty" because we find that Performance did not make out its prima facie case that there was a covered loss.[13]  It is an insured's burden to put forth evidence to show that its claim against an insurer is within the policy's coverage.  See Sentry Ins. v. R.J. Weber Co., 2 F.3d 554, 556 (5th Cir. 1993) (interpreting Texas law).  According to

---

[11]    Though Mid-Continent's appellate brief contains considerably more detail on this argument than its motion for summary judgment did, we do not find this argument waived because Mid-Continent has argued all along that Performance has not made out a case for coverage and that Performance has not set forth evidence showing the value of the trade-in vehicle.

[12]    The district court also suggested that there was no covered loss because Performance was able to write off the loss. We do not address this finding.

[13]    While the district court did not rule on the Wall trade-in claim using this reasoning, the district court's ruling reflected that it was troubled, as we are, by Performance's failure to prove the value of the trade-in vehicle that was lost.

the policy, Performance must prove a "loss of . . . Covered Property resulting directly from the Covered Cause of Loss."[14] The puzzling aspect of this claim is Performance's characterization and attempted valuation of the covered property. Throughout this litigation, Performance has claimed that its loss due to the fraudulent trade-in was a $2,000 cash down payment and a $12,700 trade-in vehicle.[15] Mid-Continent paid the $2,000 to account for the down payment that was never received. What is at issue now is what else, if anything, Mid-Continent owes. Performance claims it is due $12,700, which is the value that Wall, the dishonest employee, attributed to the trade-in vehicle. Part of Performance's burden in showing coverage is to show the value of the covered property. See Cotton Belt Ins. Co. v. A. Campdera & Co., 218 F.2d 76, 79 (5th Cir. 1954) ("Where property is destroyed or injured, which has a market value, this must be shown by the owner as the measure of damages.") (quoting Int'l-Great-N. R.R. Co. v. Casey, 46 S.W.2d 669, 670 (Tex. Comm'n App. 1932, holding approved)); see also Wallis v. United Servs. Auto. Ass'n, 2 S.W.3d 300, 302-03 (Tex. App.—San Antonio 1999, pet. denied) (explaining, in the context of the doctrine of concurrent

---

[14] Covered Property is "'money', 'securities', and 'property other than money and securities'." The policy defines "property other than money and securities" as "any tangible property other than 'money' and 'securities' that has intrinsic value but does not include any property [specifically exempted]."

[15] As Michael Avellar stated: "As a result of this transaction [Wall transferring title to her mother], Performance Ford suffered a loss of $2,000.00 in cash and the value of the 1997 Ford Taurus trade-in." Performance has never claimed that its covered property was the new Ford Taurus.

causes, that an insured must prove the value of his loss).
Performance has never attempted to arrive at the value of the
trade-in vehicle by working backward from the value of the new
Ford Taurus.  Rather, on this record Performance's sole basis for
valuing its loss is its dishonest employee's assessment of her
mother's trade-in vehicle.  Apparently this trade-in vehicle was
never seen by anyone at Performance other than Wall, creating a
question on this record whether the vehicle even existed.  Under
the circumstances that obtained here, the dishonest employee's
assessment of the value of the vehicle does not suffice to
establish the value of the vehicle, and there is no other
evidence of value in the record.  Performance has thus not
created a genuine issue of material fact that it suffered a
covered loss.  We affirm the district court on this claim.

**C.  Wall Unauthorized Pay Increase Claim**

We next consider whether the district court erred in
granting Mid-Continent's summary judgment motion on the Wall
unauthorized pay increase claim.

Performance argues that unauthorized pay increases are
covered by the policy as a matter of law because Wall's salary
increase was not "earned" and was not obtained "in the normal
course of employment."  Mid-Continent argues that summary
judgment in its favor was appropriate because unauthorized pay
increases are excluded under the terms of the policy as a matter
of law.

The district court determined that the policy does not

provide coverage for unauthorized pay increases due to employee dishonesty. The district court rejected Performance's argument that "in the normal course of employment" is ambiguous and that the phrase does not cover salary increases obtained through fraud. The district court instead found that the language means that "the policy does not reimburse the insured for the salaries paid to an employee during the time that an employee was committing acts of dishonesty against the insured, although the loss incurred by the act of dishonesty may be covered."[16]

We agree with the district court. According to the policy, employee dishonesty includes instances where an employee dishonestly obtains a financial benefit, but the financial benefit must be one "other than employee benefits earned in the normal course of employment, including: salaries . . ." The plain language of the policy excludes unauthorized salaries obtained due to employee dishonesty.

Though Performance argues that the Wall salary increases are covered losses because the benefits were not earned "in the normal course of employment" because they were due to fraud and the funds were not "earned" because they were stolen, the one Texas court to consider this language specifically rejected those arguments. See Dickson v. State Farm Lloyds, 944 S.W.2d 666, 668 (Tex. App.—Corpus Christi 1997, no writ). In Dickson, an insured

---

[16] The district court also found that Performance did not make out a prima facie case of coverage because it did not show the pay increases were unauthorized. We do not address this holding.

filed a claim under his employee dishonesty policy to obtain reimbursement for losses based on two employees manipulating the time card system to obtain extra compensation. Id. at 668. The court noted that there were no Texas cases construing the policy language at issue but that courts of several sister states had found that the exclusion bars coverage for employee benefits that were dishonestly obtained. See id. The Dickson court concluded that "when an employee has dishonestly or fraudulently obtained for himself only salary or other such employee benefits," the policy unambiguously excludes coverage.[17] Id. The majority of courts that have considered this exclusion agree. See Mun. Sec., Inc. v. Ins. Co. of N. Am., 829 F.2d 7, 9-10 (6th Cir. 1987) (interpreting exclusion to exclude an employee's increased commissions obtained by fraud); James B. Lansing Sound, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 801 F.2d 1560, 1567 (9th Cir. 1986) (finding, under California law, that commissions on fraudulent sales were clearly excluded); Hartford Accident & Indem. Ins. Co. v. Wash. Nat'l Ins. Co., 638 F. Supp. 78, 82-84 (N.D. Ill. 1986) (holding that fraudulently obtained commissions were excluded); Benchmark Crafters, Inc. v. Northwestern Nat'l

---

[17] The language of the policy exclusion in Dickson is virtually identical to the exclusion in this case. Performance attempts to distinguish Dickson by saying that the phrase "in the normal course of employment" in that case modified only the phrase "other employee benefits," not "salaries," while the phrase "in the normal course of employment" in this case applies to salaries. This distinction is unpersuasive, especially because the Dickson court expressly found in that case that the phrase "in the normal course of employment" did modify "salaries." See id. at 667-68.

Ins. Co. of Milwaukee, 363 N.W.2d 89, 91 (Minn. Ct. App. 1985) (excluding loss due to an employee submitting false orders to obtain salary and benefits); Mortell v. Ins. Co. of N. Am., 458 N.E.2d 922, 929 (Ill. Ct. App. 1983) (excluding commissions due to unauthorized trading).

A few cases in other jurisdictions support Performance's construction of the policy language. In Cincinnati Insurance Co. v. Tuscaloosa County Parking & Transit Authority, for example, the Alabama Supreme Court, considering nearly identical policy language, found that unauthorized salary increases obtained due to employee dishonesty were covered losses because "salaries" means only "authorized salaries" and the salaries were "stolen," not "earned." 827 So. 2d 765, 767-78 (Ala. 2002). This holding is supported by two other cases. See FDIC v. St. Paul Fire & Marine Ins. Co., 738 F. Supp. 1146, 1160 (M.D. Tenn. 1990), modified on other grounds, 942 F.2d 1032 (6th Cir. 1991); Klyn v. Travelers Indem. Co., 709 N.Y.S.2d 780, 781 (N.Y. App. Div. 2000) (finding coverage when an insured's comptroller paid himself excessive salary and bonuses).

Though Dickson, as a Corpus Christi Court of Appeals case, is not binding this court, we believe it likely that the Texas Supreme Court would adopt its reasoning and interpret the policy language to exclude coverage, particularly because the Dickson holding is the majority view. Looking at the plain language of the policy, the interpretation rejecting coverage makes sense. If "in the normal course of employment" means "not obtained

through employee dishonesty," the policy language excluding salaries would become mere surplusage. That is, the language excluding salaries presumes that there are acts of employee dishonesty that result in increased employee benefits that the insured and insurer agreed to exclude from coverage. Further, as one court noted, "unearned salaries and commissions are nevertheless still salaries and commissions and therefore belong to the generic category of employee benefits that are normally earned in the course of employment." Hartford Accident & Indem. Ins. Co., 638 F. Supp. at 84.

Turning to the facts of this case, our result is clear. Wall obtained unauthorized salary increases for herself and another employee while employed by Performance. This loss is not covered by the plain language of the policy, which exempts salaries from the category of employee dishonesty losses. Though the district court did not rely on Dickson,[18] we find it persuasive here. Thus, we conclude that there is no coverage as a matter of law and we affirm summary judgment in favor of Mid-Continent on the Wall salary claim.

**D.    Texas Insurance Code Misrepresentation Claim**

Having resolved the issues of policy coverage, we turn to Performance's extracontractual claims and consider, first, whether the district court properly granted Mid-Continent summary

---

[18]    The district court instead reviewed the plain language of the policy and determined that salary increases due to employee dishonesty were excluded.

judgment on the misrepresentation claim.

Performance argues that the district court erred in granting summary judgment to Mid-Continent because Mid-Continent's agent made misrepresentations about the scope of policy coverage. Mid-Continent responds that Performance has not shown both that Morgan was an agent and that the statements were false. The district court determined that Morgan's statements were too general to be actionable and that the statements were non-actionable because they were true.

The Texas Insurance Code makes false statements by an agent of an insurance company actionable.[19] See Tex. Ins. Code Ann. art. 21.21, § 4(1) (Vernon 1981 & Supp. 2003). To make out a prima facie case of misrepresentation, an insured must show that the person making the statement was an agent of the insurance

---

[19]    The Texas Insurance Code makes actionable:

[m]aking, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statements as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance . . .

Tex. Ins. Code Ann. art. 21.21, § 4(1).

company and that the statement was false.  See Celtic Life Ins.
Co. v. Coats, 885 S.W.2d 96, 98-99 (Tex. 1994); Royal Globe Ins.
Co. v. Bar Consultants, Inc., 577 S.W.2d 688, 690-91 (Tex. 1979).

First, Performance set forth sufficient evidence to create
a genuine issue of material fact as to whether Morgan was an
agent of Mid-Continent.  A person may be deemed an agent if an
insurance company has authorized that person to sell its
policies.  See Tex. Ins. Code Ann. art. 21.02 (Vernon 1981 &
Supp. 2002) (defining an agent as "[a]ny person who solicits
insurance on behalf of any insurance company . . .").  The Texas
Insurance Code does not "require either expressly or by
implication that an agent have actual authority before an
insurance company can be found to have vicariously committed a
deceptive act or practice."  Bar Consultants, 577 S.W.2d at 693.
That is, an insurance company may be liable for the misstatements
of an agent simply because it authorized the agent to sell its
policies, even if it did not authorize the agent to make the
misstatements.  See id.  Performance put forth the affidavit of
Michael Avellar, which states that he purchased insurance
policies from McKane Morgan and that, in purchasing the policies,
he dealt with McKane and Morgan.  Mid-Continent argues that
"[t]he record contains no evidence of the nature or type of
agency relationship" which exists between Mid-Continent and
McKane Morgan.  However, it is clear from the Avellar affidavit
that McKane Morgan was authorized to sell Mid-Continent policies,
and Mid-Continent does not dispute this fact.  Further, the key

case Mid-Continent cites supports Performance, for it holds that a person who sells an insurance policy should be considered an agent whose misrepresentations are attributable to the insurer. See Coats, 885 S.W.2d at 98-99. This is enough to create a fact issue on the question of agency.

Second, Performance has created a genuine issue of material fact as to whether Morgan's statements were actually false. The only evidence in the record documenting what Morgan said is Avellar's affidavit. According to Avellar, Morgan stated "that an inventory shortage, without more, would not be covered by the employee dishonesty coverage we were purchasing" but "that the employee dishonesty policy would cover inventory losses when there was evidence of criminal activity by an employee." Avellar continues: "[s]he advised me that when there was independent evidence of employee theft, the inventory shortage would be covered in its entirety." Mid-Continent does not appear to dispute that Morgan made these statements.[20] The statements could be interpreted one of two ways. First, the statements

---

[20] Mid-Continent instead argues that the statements are too broad to be actionable, citing Griggs v. State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999). However, the specific statements Morgan made in this case are not the type of mere puffery deemed non-actionable in Griggs. See id. at 701 (finding an agent's statements that she would handle claims "professionally" and that she would "monitor the progress of Griggs' claim" were non-actionable). Rather, the statements in this case are specific statements about the scope of policy coverage, which the Texas courts have found actionable. See, e.g., Lexington Ins. Co. v. Buckingham Gate, Ltd., 993 S.W.2d 185, 195 (Tex. App.—Corpus Christi 1999, pet. denied) (finding that an agent's statement that a policy "cover[ed] all risks," when the policy included several exclusions, was an actionable misrepresentation).

could convey that the entire amount of an inventory shortage is covered when there is any evidence of employee dishonesty. Second, the statements could convey that an inventory shortage is covered only when the entire shortage is substantiated by proof of employee dishonesty. Either way, because we conclude that there is no coverage without some evidence linking the dishonest employee to the entire amount of the loss, Morgan's statements were arguably false. We thus reverse summary judgment in favor of Mid-Continent on the misrepresentation claim.

### E.    Texas Insurance Code Claim for Bad-Faith Coverage Denial

We next consider whether the district court erred in granting Mid-Continent's motion for summary judgment on the bad-faith claim denial issue.

Performance argues that the district court improperly granted summary judgment because Performance raised a fact issue as to whether Mid-Continent had a reasonable basis to delay or deny payment of the claims. Mid-Continent argues that summary judgment was proper because it correctly denied Performance's claims. The district court determined that Mid-Continent was entitled to summary judgment because Performance did not show Mid-Continent acted unreasonably and because Mid-Continent properly denied the claims.

The Texas Insurance Code prohibits bad-faith claim denial under Article 21.21. The prohibited conduct includes "failing to attempt in good faith to effectuate a prompt, fair, and equitable

settlement of a claim with respect to which the insurer's liability has become reasonably clear."  Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)(ii) (Vernon 1981 & Supp. 2003).  A cause of action exists under this statute when an insurer "has <u>no reasonable basis</u> for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial."  <u>Higginbotham v. State Farm Mut. Auto. Ins. Co.</u>, 103 F.3d 456, 459 (5th Cir. 1997).  "In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim."  <u>Id.</u>  But "[a]s long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith."  <u>Id.</u>

Because we affirm summary judgment in favor of Mid-Continent on the merits of Performance's three claims, we affirm summary judgment in favor of Mid-Continent on this claim as well.  Mid-Continent's denial of coverage was not only reasonable, it was ultimately correct.  Further, Performance has not set forth any evidence suggesting bad faith or unreasonable delay.

**F.  Texas Insurance Code Claim for Statutory Penalties**

We now consider whether the district erred in granting Mid-Continent summary judgment on Performance's final

extracontractual claim, its claim for statutory penalties.

Performance argues that the district court erred in granting summary judgment for Mid-Continent because Mid-Continent improperly denied coverage. Mid-Continent argues that summary judgment was proper on each of the three claims, so no statutory penalties are warranted. The district court rejected Performance's statutory claim for damages because it found that Mid-Continent properly denied coverage on all of the claims.

The Texas Insurance Code provides for statutory damages for failure to pay an insurance claim within a specified time if an insurer is found liable under a policy, even if the insurer had a reasonable basis for denying coverage. See Tex. Ins. Code Ann. art. 21.55, §§ 3(f), 6 (Vernon 1981 & Supp. 2003); see also St. Paul Reinsurance Co. v. Greenberg, 134 F.3d 1250, 1255 (5th Cir. 1998) ("[T]he Texas penalty applies automatically if the claim is not paid within the period allowed."). Statutory damages apply if the insurer has delayed payment of a valid claim for more than sixty days. See Higginbotham, 103 F.3d at 461; Tex. Ins. Code Ann. art. 21.55, § 3(f).[21]

The sole basis for finding liability under Article 21.55, then, is that the requisite time has passed and the insurer was ultimately found liable for the claim. Because we find that the district court properly granted summary judgment for Mid-

---

[21] The statutory rate of damages is the amount of the claim plus 18% of the amount of the claim per annum. See Tex. Ins. Code Ann. art. 21.55, § 6.

Continent on each of Performance's three claims, we affirm the district court's grant of summary judgment on this issue as well.

### G.    Motion to Supplement the Record

Finally, we address whether the district court abused its discretion in denying Performance's motion to supplement the record after the magistrate judge recommended granting summary judgment in favor of Mid-Continent.  Performance argues that the district court abused its discretion in denying its motion to supplement the summary judgment record to create a fact question. Mid-Continent does not directly address this issue on appeal. The district court effectively denied[22] Performance's motion without providing reasons for its decision.

We find that the district court did not abuse its discretion in denying Performance's motion.  As we have previously stated:

> [I]t is clear that the district court has wide discretion to consider and reconsider the magistrate judge's recommendation.  In the course of performing its open-ended review, the district court need not reject newly-proffered evidence simply because it was not presented to the magistrate judge.  Litigants may not, however, use the magistrate judge as a mere sounding-board for the sufficiency of the evidence.

Freeman v. County of Bexar, 142 F.3d 848, 852 (5th Cir. 1998). We further suggested several factors that a court should consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued, including: (1) the moving party's reasons for not originally submitting the

---

[22]    The district court did not formally rule on this motion, but the parties appear to consider it as denied, and we agree that it was effectively denied.

evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted. See id. at 853.

These factors generally weigh against allowing Performance to supplement the record. Performance wished to submit the following evidence: (1) an affidavit from Ned Green, Chief Financial Officer of Performance, that Performance never received the trade-in vehicle from Wall's mother; (2) an affidavit from Green stating that Wall gave herself and another employee an unauthorized pay raise; and (3) portions of a deposition of Kirby Pancoast, Mid-Continent's corporate representative, in which he stated that Morgan misrepresented the policy's terms. The first two pieces of evidence likely would not have changed the district court's decision. Even assuming that Performance could prove the trade-in vehicle was never received, the district court would still have denied coverage because the loss was an excluded "indirect loss." Similarly, even if Performance submitted additional evidence that the pay increases were unauthorized, the district court likely would still have read the unambiguous policy language to preclude coverage. The third piece of evidence, though, was likely relevant to the misrepresentation claim. This evidence was available to Mid-Continent when it prepared the summary judgment motion, which cuts in favor of

allowing its admission.  But Performance did not explain why it did not introduce this evidence originally.  Instead, Performance waited to offer this evidence until after it was clear that summary judgment for Mid-Continent would be granted.  With Performance providing no reason why it failed to introduce the evidence earlier, the district court clearly did not abuse its discretion in disallowing this evidence.

## IV.  CONCLUSION

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.  Each party shall bear its own costs.