United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 6, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-50464

BRADY NATIONAL BANK

and

TEXAS COUNTRY BANCSHARES, INC.

Plaintiffs-Appellees,

VERSUS

GULF INSURANCE COMPANY, et al.

Defendants,

GULF INSURANCE COMPANY

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Texas

(01-CV-392)

Before DEMOSS, DENNIS, and PRADO Circuit Judges.

DENNIS, Circuit Judge:[*]

In this case, we review summary judgments resolving coverage

disputes with respect to a financial institution special bond

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

between Brady National Bank, the insured, and Gulf Insurance Company, its insurer. Defendants-Appellants Gulf Insurance Co., *et. al.* ("Gulf") appeal from the district court's grant of summary judgment in favor of Brady National Bank and Texas County Bancshares, Inc. ("Brady National"), and the denial of Gulf's Rule 59(e) motion. Gulf timely appealed. We AFFIRM the district court's grant of summary judgment on all issues except for the award of $35,515.55 to Brady National for costs and attorneys' fees incurred because of its intervention as a plaintiff in a conspiracy to defraud action in Texas state court. Because we conclude that the district court's summary judgment award and subsequent denial of the Rule 59(e) motion with regard to those costs and fees is in error, we REVERSE this part of the district court's summary judgment ruling and RENDER summary judgment on this issue in favor of Gulf.

## I.   BACKGROUND

In early 1998, Brian Russell Stearns ("Stearns") created a Ponzi scheme that eventually defrauded investors of more than $50 million before his arrest in September of 1999. A few months prior to that arrest, Stearns opened a personal checking account with Brady National. Within days of opening that account, Stearns instructed his attorneys to wire $12.5 million of funds Stearns had obtained from his investor victims and deposit those funds in

2

Stearns' newly opened checking account at Brady National. Stearns immediately purchased a $1 million CD from Brady National using the investor funds in his personal checking account. Stearns promptly pledged that CD as collateral on an $800,000 personal letter of credit loan and two personal credit card accounts, each with a $100,000 limit.

Soon after these initial transactions, Stearns had his attorneys wire an additional $6 million dollars of investors' funds to Stearns' checking account at Brady National and with those funds, he purchased a second CD in the amount of $100,000. Stearns then pledged this second CD as collateral on a $41,000 personal line of credit account. After these transactions, Stearns was arrested, charged, and convicted in federal district court of 82 counts of mail fraud, wire fraud, securities fraud, money laundering, social security fraud, false statements on loan applications, and being a felon in possession of a firearm.

Along with Stearns' arrest, the federal government seized both CDs and initiated forfeiture proceedings in federal district court. Brady National intervened as a claimant in those proceedings in order to protect its interest in the CDs and asserted a defense of innocent ownership.[2] The district court ruled in favor of the

---

[2]The civil forfeiture statute under which the CDs were seized prohibits forfeiture of property "to the extent of the interest of an owner or lienholder" so long as that owner or lienholder has no knowledge of the criminal violation that gave rise to the

government, but the government never enforced the forfeiture order. The CDs were ultimately returned to Brady National.

Just before the judgment of forfeiture was entered, Brady National declared the sums borrowed by Stearns on an $800,000 letter of credit, two credit cards, and the $41,000 line of credit in default and accelerated the due date on those sums.[3] Brady National then liquidated the CDs to pay off those debts.

After the CDs were applied toward Stearns' debt to Brady National, the investors Stearns had defrauded in the Ponzi scheme sued Stearns and Brady National. Brady National eventually settled with these investors. Soon after settling with the investors that Stearns had defrauded, Brady National intervened as a plaintiff in a lawsuit filed by Stearns' investors against Stearns' former law firm. Brady National alleged, *inter alia*, that the law firm conspired with Stearns to defraud the investors and Brady National.

As a result of the settlement with Stearns' investors, and the prior forfeiture action, Brady National claims a net loss under the

forfeiture proceedings. See 18 U.S.C. § 981(a)(2).

[3]The record shows that as of May 12, 2000, Stearns owed: (1) $849,835.51 in principal and interest on the $800,000 letter of credit; (2) $115,155.03 and $99,959.04 in principal and interest on each of the credit cards, respectively; and (3) $ 42,703.65 in principal and interest on the $41,000 line of credit. Additionally, attorneys' fees were assessed in the amounts of: (1) $26,459.86 on the $800,000 letter of credit; (2) $3,582.89 and $3,110.09 on the credit cards; and (3) $3,252.87 on the line of credit.

CDs of $800,801.40. It also claims that the aggregate court costs and attorneys' fees it incurred in the forfeiture action and the investors' lawsuit was $448,864.29. Brady National contends that it incurred $35,515.55 in costs and attorneys' fees because of its intervention as a plaintiff in the lawsuit against Stearns' law firm.

Gulf had previously issued a financial institution special bond (the "Bond")[4] to Brady National. Brady National provided proper notice of its impending claims and sought to be indemnified by Gulf for both the loss and costs and attorneys' fees.

Gulf denied coverage, claiming that Brady National's loss was not covered under the Bond. Brady National then filed suit in district court seeking monetary damages in the amounts of: (1) $800,801.40 resulting from the net loss related to two Certificates of Deposit ("CDs"); (2) $448,864.29 in costs and attorneys' fees resulting from a forfeiture action commenced by the United States Internal Revenue Service ("IRS") and the investors' lawsuit; (3) $35,515.55 in additional costs and attorneys' fees Brady National has incurred in asserting a claim for conspiracy to defraud against Stearns' former law firm; and (4) $15,130.33 in costs and attorneys' fees incurred in bringing this lawsuit.

---

[4]The Bond in question is described by the parties as a "fidelity policy," which the parties agree is a first party insurance contract that covers specific events and risks of loss.

Brady National and Gulf filed cross-motions for summary judgment. The district court determined that Brady National's loss was covered under the Bond, and awarded it complete relief. Gulf filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but the district court summarily denied that motion. Gulf timely appealed.

## II. ANALYSIS

We review this grant of summary judgment *de novo*. See Beeler v. Rounsavall, 328 F.3d 813, 816 (5th Cir. 2003). The parties agree that the substantive law of Texas applies to resolve the dispute in this diversity case. In Texas, courts employ general rules of contract construction to insurance policies. See Balandran v. Safeco Ins. Co. of Am., 972 S.W. 2d 738, 740-41 (Tex. 1998). The terms of an insurance policy are unambiguous as a matter of law if they can be given a definite or certain legal meaning. Nat'l Union Fire Ins. CO. v. CBI Indus., Inc., 907 S.W. 2d 517, 520 (Tex. 1983). Absent an ambiguity, our duty is to enforce the policy according to its plain meaning. See Puckett v. United States Fire Ins. Co., 678 S.W. 2d 936, 938 (Tex. 1984). Disagreement between the parties regarding the question of coverage "does not create an ambiguity." Sharp v. State Farm Fire & Cas. Ins. Co., 115 F.3d 1258, 1261 (5th Cir. 1997)(applying Texas law).

If terms in an insurance contract are subject to more than one

reasonable interpretation, however, those terms are ambiguous. See CBI Indus., 907 S.W.2d at 520. Under Texas law, ambiguous terms are construed in favor of coverage. See Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 665 (Tex. 1987). Because the Bond itself is equivalent to a "fidelity policy," and the same liberal rules of construction that are applied to insurance contracts are applied to fidelity policies under Texas law, see Federal Deposit Ins. Corp. v. Aetna Cas. & Surety Co., 426 F.2d 729, 736 (5th Cir. 1970); Great Am. Ins. Co. v. Langdeau, 279 S.W.2d 62, 65 (Tex. 1964), any ambiguity in the Bond provisions will be construed against Gulf and in favor of coverage. See Snyder Nat'l Bank v. Westchester Fire Ins. Co., 425 F.2d 849, 852 (5th Cir. 1970).

Whether Brady National was afforded coverage depends on (1) whether the CDs were "stolen" for the purposes of the "Securities" provision of the Bond,[5] and if so, (2) whether Brady National's loss was caused directly by the stolen CDs. Finally, we must consider whether the Bond permits Brady National to recover any of its claimed costs and attorneys' fees.

## A.  "Stolen"

Brady National contends that its net loss under the CDs of

---

[5]Alternatively, Brady National sought coverage under the "On Premises" provision of the Bond. Because we conclude that the CDs were "stolen" and therefore covered under the "Securities" provision of the Bond, we need not consider the question of coverage under the "On Premises" provision.

$800,801.40 is covered under the "Securities" and "Court Costs and Attorneys' Fees" provisions of the Bond. The relevant portion of the "Securities" provision is as follows:

> *Loss resulting directly from the insured having in good faith and in the usual course of business, whether for its own account or for the account of others:*
>
> > *A. Purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability on the faith of any Certificated Security which. . . (2) is lost or stolen. . . .*

Both parties agree that CDs are "Certificated Securities," and Gulf does not challenge the extent of Brady National's claimed loss, so the critical issue is whether the CDs were "stolen." Although the Bond does not expressly define the term "stolen," Gulf argues that the generally accepted definition of "stolen" does not encompass CDs purchased with stolen money. Gulf further argues that the term "stolen" is not an ambiguous term as it is used in the Bond.

Brady National contends that it is only logical to find that a CD purchased with stolen money is "stolen" for the purposes of the "Securities" provision, relying on our prior decision in Bank of the Southwest v. Nat'l Surety Co., 477 F.2d 73, 76 (5th Cir. 1973). Brady National also contends that the term "stolen" is ambiguous as it is used in the Bond. In ruling for Brady National, the district court concluded that the CDs were "stolen" for the

8

purposes of the Bond because they were acquired with stolen money. We agree.

First, we find that the contention that "stolen" has a generally accepted definition and that the term is therefore unambiguous as it is used in the Bond is incorrect. Not only does the Bond itself fail to define the term "stolen," the Supreme Court has previously stated that the term "'stolen' has no accepted or common-law meaning." See United States v. Turley, 352 U.S. 407, 411-12 (1957).

Second, we find that the term "stolen" may be defined more broadly than Gulf contends. Gulf argues that the CDs were not "stolen" because Stearns "bought" them from Brady National, and because they were "bought" they were not "tak[en] from another party dishonestly." See Defs' Reply Br. at pg. 3 (citing the WEBSTER'S NEW WORLD DICTIONARY 585 (1979)). But Black's Law Dictionary has a more expansive definition of "stolen." Black's defines "stolen" as "[a]cquired, or possessed, as a result of some wrongful or dishonest act or taking, whereby a person willfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the intent to deprive the owner of the benefit of ownership." See BLACKS' LAW DICTIONARY 1419 (6th ed. 1991). See also OXFORD ENGLISH DICTIONARY (2d ed. 1989)(defining "stolen" as the past participle of steal, "to take

9

or appropriate the property of another dishonestly); AMERICAN HERITAGE DICTIONARY 1337 (3d ed. 1993) (defining "stolen" as the past participle of steal, "to take the property of another without right or permission").

Because "stolen" is not defined in the Bond, has no generally accepted or common-law meaning, and because it is defined narrowly or expansively depending on the selected dictionary meaning, we conclude that the term is subject to more than one reasonable interpretation. Under Texas law, terms in insurance contracts that are subject to more than one reasonable interpretation are ambiguous, CBI Indus., 907 S.W.2d at 520, and construed in favor of coverage. See Barnett, 723 S.W.2d at 665. Therefore, we conclude that the definition of "stolen" as used in Bond should be construed in favor of coverage and would encompass the CDs in this case because the CDs were "acquired, or possessed as a result of some dishonest act or taking." See BLACKS' LAW DICTIONARY 1419 (6th ed. 1991).

Our prior decision in Bank of the Southwest v. Nat'l Surety Co., 477 F.2d 73, reinforces this conclusion. In Bank of the Southwest, a plaintiff bank sought recovery under a banker's blanket bond for losses sustained on three collateral loan transactions. See 477 F.2d at 75. The bank loaned a person representing himself as a wholesale automobile dealer, and accepted

10

certain documents purporting to convey a security interest in two automobiles and stock shares as collateral. Id. Soon after the loans were made, the bank discovered that the documents tendered by the dealer did not give the bank any rights to the pledged collateral. Id. at 75. Additionally, the stock certificates pledged to the bank were never delivered by the dealer as promised. Id. Instead, the dealer converted the stock certificates to his own use. Id.

In order to determine whether the documents were "stolen," and therefore entitled to coverage, we focused on whether there was any evidence that the bank had to give up the allegedly stolen document to the rightful owner. Id. at 77 (citing Maryland Cas. Co. v. State Bank & Trust Co., 425 F.2d 979). Because there was no such evidence in the Bank of the Southwest case, we determined that the documents were not "stolen." Id. But in this case, there is ample evidence that Brady National would have had to give up the CDs.

First, in the forfeiture proceedings, the district court found that the CDs were subject to forfeiture. Second, Texas law dealing with constructive trusts further indicates that the CDs would have had to be returned to their rightful owners for summary judgment purposes. In Texas, constructive trusts may be imposed when a party holds property or funds that in equity and good conscience belongs to another. See Ginther v. Taub, 675 S.W.2d 724, 728 (Tex.

11

1984). Stearns' criminal conviction leaves no doubt in this case that all the funds used to purchase the CDs were acquired by fraud and that the CDs rightfully belonged to Stearns' investors. Moreover, Texas courts would impose a constructive trust on the CDs in favor of Stearns' investors even though Brady National was unaware of Stearns' fraud. See Pope v. Garrett, 211 S.W.2d 559, 562 (Tex. 1948).

Therefore, due to the ambiguity of the term "stolen," and under the analysis in Bank of the Southwest, we conclude that the CDs were "stolen" as that term is used in the "Securities" provision of the Bond. Because the Securities provision of the Bond only provides coverage for "loss resulting directly" from Brady National's extension of credit based on the CDs, we must now determine whether the CDs directly caused Brady National's loss.

B. **"Directly Caused"**

Brady National contends that its losses were directly based on its extension of credit secured by the stolen CDs. Brady National reasons that if the CDs not been "stolen" at the time it extended credit, the CDs would not have been subject to forfeiture or the investors' claims. The district court accepted Brady National's reasoning and ruled in Brady National's favor. Gulf argues that Brady National's loss did not directly result from the CDs, and therefore that the district court erred in ruling for Brady

National, for two reasons.  First, Gulf argues that in order for Brady National's loss to have directly resulted from the stolen CDs, the CDs must have had a defect in title at the time the CDs were pledged to Brady National.  Second, Gulf argues that it was not the stolen CDs that directly caused Brady National's loss but rather Brady National's subsequent settlement of the investors' claims against the CDs.

In support of its first argument, Gulf cites Resolution Trust Corp. v. Aetna Casualty & Surety Co., 25 F.3d 570 (7th Cir. 1994). But while we find the language of the relevant bond provision in Resolution Trust similar to the "Securities" provision here, we find Gulf's first argument unpersuasive.  In Resolution Trust, one of the issues was whether the insured met the condition precedent of "possession" in order to be eligible for coverage.  See 25 F.3d at 580.  Because the policy at issue in Resolution Trust required the insured to have "in good faith acquired" the stolen security, the insured in Resolution Trust must have had possession of the security. Id. The Seventh Circuit reasoned that the insured could not have in "good faith" acquired a security if the insured did not simultaneously possess that security.  Id.  Moreover, in order to be a stolen security eligible for coverage, that security had to "have a defect in title" at the time the insured first possessed it.  Id.  Because the security at issue in Resolution Trust was

stolen after the insured acquired it, the Seventh Circuit determined that there was no coverage. Id.

Here, the Bond's "Securities" provision is similar to the one in Resolution Trust because Brady National must have "in good faith and in the usual course of business. . .extended any credit. . .on the faith of any [CD] which. . .is stolen." Additionally, Brady National must also have "actual physical possession of [the CD]" at the time it extended credit in order to be eligible for coverage. But unlike the security in Resolution Trust, the CDs in this case had a defect in title at very moment that Brady National extended credit to Stearns.

First, neither party has alleged that Stearns ever had any personal right to the funds he deposited in Brady National and used to buy the CDs. The record shows that those funds were wired to him directly from investors and Stearns then wired those funds into his newly opened personal checking account, which was in contravention of Stearns' agreement to immediately invest those funds for the benefit of the investors. The CDs purchased by Stearns with those funds were then pledged as collateral for personal line of credit loans and credit cards for his personal use. A review of the record shows those accounts were used to buy things such as jewelry, automobiles, private jets, and Las Vegas vacations.

14

Second, there is no indication or allegation that these purchases were intended for the benefit of Stearns' investors and the parties have not contended that any of these purchases were intended to be investments. In convicting Stearns on all wire fraud and securities fraud counts, including the counts tied to the transactions with Brady National,[6] the district court necessarily made a finding that Stearns intended to defraud his investors at the time he took the funds and wired those funds to Brady National.[7] Thus, because the record shows that Stearns never had any right to the CDs, it also shows that the CDs had a defect in title at the time Brady National extended credit on those CDs. Given that the record amply indicates that the CDs were in Brady National's possession at the time Brady National extended credit to Stearns, we reject Gulf's first argument.

Gulf's second argument is more easily dismissed. Gulf argues that the harm suffered by Brady National resulted from the settlement of the investors' claims instead of reliance on the stolen CDs. But under Texas law, mere settlement of a claim resulting from a harm that would be covered by an insurance policy does not mean that the loss came from the settlement as opposed to

---

[6]See R. 242-245.

[7]18 U.S.C. § 1341 (mail fraud statute); 18 U.S.C. § 1343 (wire fraud statute).

15

the covered harm.  See <u>Willcox v. Am. Home Assur. Co.</u>, 900 F. Supp. 850, 856 (S.D. Tex. 1995); <u>See</u> ANN. BANKER'S BLANKET BOND, FIRST SUPPL. 5 (Am. Bar Assn. 1983).  And the language of the provision itself provides coverage so long as Brady National, "in good faith and in the usual course of business. . .extended any credit or assumed any liability on the faith of any Certificated Security which. . . (2) is lost or stolen."

Because settlement of a claim resulting from a covered harm under an insurance policy does not constitute a loss resulting from the settlement as opposed to the covered harm, <u>see</u> <u>Willcox</u>, 900 F. Supp. at 856, it is undisputed that Brady National extended credit based on the CDs in "good faith," and we have concluded that those CDs were "stolen," then the loss attributable to Brady National's settlement of the investors' claims against the CDs is a covered loss under the Bond.

**C.  Court Costs and Attorneys' Fees**

According to Brady National, because its loss attributable to the CDs was covered under the Bond, all of the court costs and attorneys' fees it incurred in connection with its loss are recoverable under the "Court Costs and Attorneys' Fees" provision of the Bond.  That provision reads:

> *Sums incurred and paid by the Insured as court costs and reasonable attorneys' fees in defending any suit or proceeding bought against the Insured to enforce the liability or alleged*

16

*liability of the Insured for any loss, claim or damage, which would constitute a valid and collectible loss under this bond.*

Gulf does not challenge the reasonableness of the costs and fees sought by Brady. Gulf's sole argument at summary judgment on this issue was that because there is no coverage under the Bond for any of Brady National's losses, there is no coverage for costs and attorneys' fees.[8] The district court rejected that argument and ruled in favor of Brady National. Gulf then filed a Rule 59(e) motion challenging only part of the district court's costs and attorneys' fees ruling. Specifically, Gulf challenged the district court's award of $35,515.55 resulting from Brady National's intervention in the conspiracy lawsuit filed against Stearns' former law firm.

On appeal, Gulf reiterates its argument that no costs and fees should be recoverable because Brady National has not suffered a covered loss. Gulf also claims that even if there is a covered loss under the Bond, Brady National is not entitled to recover any of the costs and attorneys' fees it seeks because Brady National was not a "defendant" in the three legal actions in which it incurred those costs and fees.

---

[8]See R. 69, Defs' Mot. S.J., "Point VII–BECAUSE THERE WAS NO COVERED LOSS UNDER THE BOND, THERE IS NO COVERAGE FOR COURT COSTS AND ATTORNEYS' FEES."; R. 727, Defs' Reply to Pls' Mot. S.J., (same).

We need not consider Gulf's first argument, because we agree with the district court that Brady National has suffered a covered loss attributable from the "stolen" CDs. But Gulf's second argument on appeal does not dissolve upon a finding of coverage for the CDs. Thus, we must consider Gulf's second appellate argument, and in so doing, consider the scope of that argument as well as the applicable standard of review.

Brady National claims that part of Gulf's second argument on appeal, which challenges the $448,864.29 incurred in the forfeiture proceeding and the investors' lawsuit, is waived because Gulf failed to raise that part of its argument in the district court. Brady National also claims that Gulf's challenge to the $35,515.55 in costs is subject to a lesser standard of review because Gulf did not raise that part of its argument until Gulf moved to amend or alter the judgment pursuant to Rule 59(e). In response, Gulf contends that its motion for summary judgment did raise the entirety of its second appellate argument. In support of this contention, Gulf points to a single paragraph in its initial summary judgment brief.

After reading that three sentence paragraph, we disagree that Gulf has raised the same argument it wishes to present on appeal. In its motion for summary judgment, Gulf paraphrased the costs and attorneys' fees provision, described the investors' suit against

18

Brady National, and argued that the suit filed against Brady National "did not contain any allegations which, if proven true, would have resulted in a covered loss under the Bond." Defs' Mot. S.J., at pg. 9. Moreover, the argument was captioned: "BECAUSE THERE WAS NO COVERED LOSS UNDER THE BOND, THERE IS NO COVERAGE FOR COURT COSTS AND ATTORNEYS' FEES." Id. Therefore, the district court could not have reasonably interpreted Gulf's summary judgment costs and attorneys' fees argument as an argument that Brady National had to be an actual "defendant" in order to recover those costs and fees even if the loss in this case was a covered loss. That Gulf's Rule 59(e) motion conceded the award of court costs and attorney's fees sought by Brady National with the exception of the $35,515.55 incurred in the conspiracy action against Stearns' former law firm in the event that the district court did not alter its prior coverage ruling reinforces our conclusion.

"Although we can affirm a summary judgment on grounds not relied on by the district court, those grounds must at least have been proposed or asserted in that court by the movant." Johnson v. Sawyer, 120 F.3d 1307, 1316 (5th Cir. 1997); see also FDIC v. Laquarata, 939 F.2d 1231, 1240 (5th Cir. 1991)(refusing to affirm summary judgment on grounds "neither raised below ... nor even raised *sua sponte* by the district court"). In this case, Gulf did not assert its appellate argument regarding court costs and

19

attorneys' fees as to the $448,864.29 before the district court. Arguments not raised in district court are waived, because this court does not hear arguments raised for the first time on appeal. See Forbush v. J.C. Penny Co., 98 F.3d 817, 822 (5th Cir. 1996).

Gulf argues that under the rule set forth in Republic Ins. Co. v. Silverton Elevators., Inc., 493 S.W. 2d 748 (Tex. 1973), waiver cannot be applied to an insurer seeking to contest coverage, and thus Gulf is immune from our procedurally based waiver ruling. But that rule regarding waiver in Republic Insurance relied on caselaw holding that an insurer does not waive its defenses to coverage by prematurely or erroneously paying benefits. See id. Hence, we do not read the rule in Republic Insurance to confer upon insurers any immunity from procedurally based rulings.[9]

The only defense Gulf might raise to procedural waiver in this circumstance is that the waiver will result in a "manifest injustice." See Jackson v. United States Postal Service, 666 F.2d 258, 260-61 (5th Cir.1982); West India Indus., Inc. v. Tradex, 664 F.2d 946, 951-52 (5th Cir. 1981). But Gulf has not articulated any argument that adherence to the general procedural rule will result in a manifest injustice and we do not believe waiver here will

---

[9]Additionally, the substantive law of Texas does not apply to resolve this procedural question in this diversity case. See Exxon Corp. v. Burglin, 42 F.3d 948, 950 (5th Cir. 1995)(citing Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

result in any injustice. It is undisputed that Brady National was a defendant in the investors' lawsuit, and the record shows that Brady National had to file a defense in order to challenge the government's forfeiture petition. Thus, because Gulf's second appellate argument challenging the award of $448,864.29 in court costs and attorney's fees incurred in the forfeiture and investor lawsuits was not raised before the district court, it is waived on appeal. Therefore, we affirm the district court's summary judgment imposing those court costs and attorneys' fees.

It is undisputed, however, that Gulf properly raised in its Rule 59(e) motion the argument that the Bond did not provide coverage for the $35,515.55 in costs and attorneys' fees incurred by Brady National in its intervention. The district court denied Gulf's Rule 59(e) motion on this point without discussion. We review *de novo*, as questions of law, alleged errors in contract and insurance policy interpretation. See <u>T.L. James & Co., Inc. v. Traylor Bros., Inc.</u>, 294 F.3d 743 (5th Cir. 2002); <u>Performance Autoplex II LTD v. Mid-Continental Casualty Co.</u>, 322 F.3d 847, 853 (5th Cir. 2003)(internal citations omitted).

We agree with Gulf that the Bond's "Costs and Attorneys' Fees" provision can not reasonably be interpreted to cover Brady National's costs and fees associated with its intervention in the state civil conspiracy action. The Bond provision affords coverage

21

for Brady National's "liability or alleged liability. . .for any loss, claim or damage, which would constitute a valid and collectible loss under" the Bond. Thus, the Bond provision does not afford coverage for the $35,515.55 in costs and attorneys' fees because they were incurred by Brady National in an action for damages against another rather than defending against a claim by a third party seeking to hold Brady National liable for that party's loss. Therefore we find that the district court's award of $35,515.55 in costs and attorneys' fees incurred in asserting a claim for conspiracy to defraud is in error. Accordingly, we reverse the district court's grant of summary judgment to Brady National and denial of Gulf's Rule 59(e) request to modify the final judgment with regard to these specific costs and fees.

## VI. CONCLUSION

Because we have concluded that the term "stolen" is ambiguous as it is used in the "Securities" provision, and that a reasonable interpretation of that term could encompass coverage for losses sustained resulting from the "stolen" CDs in this case, we find no error in the district court's grant of summary judgment in favor of Brady National for the $800,801.40 loss resulting from the CDs. We also find no error in the district court's grant of summary judgment in favor of Brady National for $448,864.29 in costs and attorneys' fees resulting from the forfeiture action and investors'

22

lawsuit.  Accordingly, we affirm the summary judgment favoring Brady National against Gulf for recovery with respect to Brady National's loss relating to the stolen CDs and Brady National's costs and attorneys' fees relating to the forfeiture action and the investors' lawsuit.  Because we conclude that the "Court Costs and Attorneys' Fees" provision of the Bond does not afford coverage for the $35,515.55 in costs and attorneys' fees Brady National incurred as an intervener in the conspiracy to defraud lawsuit against Stearns' former law firm, we reverse the summary judgment for Brady National against Gulf and render summary judgment in favor of Gulf on this part of the case.

**AFFIRMED in part; REVERSED in part; and RENDERED**